DISTRICT COURT OF APPEAL OF FLORIDA
SECOND DISTRICT

_____

DARRIELLE ORTIZ WILLIAMS,

Appellant,

v.

STATE OF FLORIDA,

Appellee.

No. 2D2023-2200

_____

October 1, 2025

Appeal from the Circuit Court for Hillsborough County; Michael S.
Williams, Judge.

Blair Allen, Public Defender, and Pamela H. Izakowitz, Assistant Public
Defender, Bartow, for Appellant.

James Uthmeier, Attorney General, Tallahassee, and James A.
Hellickson, Assistant Attorney General, Tampa, for Appellee.

EN BANC

KHOUZAM, Judge.

Darrielle Ortiz Williams appeals an order revoking his probation.
He contends that his motion to suppress should have been granted
because the only basis for the search resulting in his arrest was the odor

of cannabis.[1]  He tells us that changes to federal and state law have eliminated "plain smell," standing alone, as a valid constitutional basis for probable cause.

We agree that legislative changes over the years to the definition and regulation of cannabis have eliminated the continuing validity of the plain smell doctrine in this context.  We accordingly hold that, under the updated statutory text, the smell of cannabis standing alone is insufficient to establish probable cause.  In doing so, we recede from prior precedent to the contrary, thereby aligning the analysis for cannabis with the totality-of-the-circumstances approach that broadly applies to other Fourth Amendment questions.

However, as our precedent expressly permitted the search at the time it occurred, we affirm the denial of suppression because in conducting it law enforcement was acting in objectively reasonable reliance on binding appellate precedent.  Finally, because the revocation order contains a scrivener's error, we remand for its correction.

## BACKGROUND

The facts are taken from testimony at the suppression hearing.

In 2008, Mr. Williams was charged with attempted first-degree murder, aggravated battery with a firearm causing great bodily harm, aggravated assault with firearm discharge, and felon in possession of a firearm.  In 2009, he entered a best-interest guilty plea to the charges

---

[1] Whereas the parties use only the general nomenclature "marijuana," herein we instead call the controlled substance by its statutory term "cannabis," which the legislature has expressly defined to exclude "marijuana" and "hemp" as those terms are otherwise defined by statutes governing medical use of marijuana, hemp, and industrial hemp.  *See* § 893.02(3), Fla. Stat. (2023).

and was sentenced to fifteen years in prison followed by ten years of probation.  Mr. Williams was released from prison in April 2023.

Later that year, Mr. Williams was the passenger in a car that law enforcement stopped for two alleged traffic violations: failure to come to a complete stop when leaving a private lot and obstructed license plate. Both of the officers involved testified that they smelled cannabis upon approaching the vehicle, although they disagreed whether it smelled "burnt" or "fresh."  The scent grew stronger as they got closer, and then "became very apparent" once Mr. Williams cracked his window.

Based only on the smell of cannabis, the officers ordered both Mr. Williams and the driver out of the vehicle.  The occupants complied, and Mr. Williams also disclosed that he was on probation.  During a search of the vehicle, officers found bags and a pill in the glove compartment. Presumptive testing indicated the bags contained cannabis.

Mr. Williams was arrested, and during a search at the district station, a plastic bag containing a white powder was found in his sock. Mr. Williams contemporaneously admitted the powder was "molly." Testing determined that the white powder was Dimethylpentylone.

Following an evidentiary hearing, the trial court denied Mr. Williams' motion to suppress the evidence.  The court thereafter found that Mr. Williams had violated two conditions of his probation relating to possessing or using intoxicants and revoked his probation.  The court's order erroneously states that Mr. Williams admitted to the violation. This appeal timely followed.

## ANALYSIS

This case presents the issue of the continued validity of the plain smell doctrine as applied to cannabis.  For generations, cannabis was illegal in all forms—thereby rendering its distinct odor immediately

3

indicative of criminal activity. But several legislative amendments over the years have fundamentally changed its definition and regulation. The cumulative result is that cannabis is now legal to possess in multiple forms, depending on discrete characteristics such as where it was procured or its chemical concentration by weight.

In 2021, this court rejected the contention that the legalization of cannabis in some circumstances "serve[d] as a sea change undoing existing precedent" regarding searches. *Owens v. State*, 317 So. 3d 1218, 1220 (Fla. 2d DCA 2021). At that time, we "h[e]ld that an officer smelling the odor of marijuana has probable cause to believe that the odor indicates the illegal use of marijuana." *Id.* at 1219.

More recently, the Fifth District considered this issue en banc and reached a contrary conclusion. Upon evaluating the updated text of Florida and federal legislation, that court held, "Because the 'plain smell' of cannabis is no longer clearly indicative of criminal activity, it alone cannot provide reasonable suspicion to support an investigatory detention." *Baxter v. State*, 389 So. 3d 803, 806 (Fla. 5th DCA 2024) (en banc). In so doing, the Fifth District certified conflict with *Owens*, expressly disagreeing with its "holding and the court's conclusion that substantive changes to the law regarding cannabis have no impact on the analysis for a warrantless search of a vehicle." *Id.* at 813.

As we now explain, we agree with the opinion in *Baxter* holding that the significant legislative amendments governing cannabis necessarily affect the Fourth Amendment analysis.

The Standard of Review

"Our constitution provides that its protection against searches and seizures 'shall be construed in conformity with the 4th Amendment to the United States Constitution, as interpreted by the United States

4

Supreme Court.' " *Carter v. State*, 389 So. 3d 759, 763 n.2 (Fla. 2d DCA 2024) (quoting art. I, § 12, Fla. Const.). "Thus, Florida courts 'are bound to follow the interpretations of the United States Supreme Court with relation to the fourth amendment.' " *Id.* (quoting *Bernie v. State*, 524 So. 2d 988, 990-91 (Fla. 1988)).

"Time and again, th[e United States Supreme] Court has observed that searches and seizures 'conducted outside the judicial process, without prior approval by judge or magistrate, are *per se* unreasonable under the Fourth Amendment—subject only to a few specifically established and well delineated exceptions.' " *Minnesota v. Dickerson*, 508 U.S. 366, 372 (1993) (quoting *Thompson v. Louisiana*, 469 U.S. 17, 19-20 (1984)).

On appeal, a trial court's ruling on a motion to suppress is presumed correct, and the reviewing court interprets the evidence and reasonable inferences in the manner most favorable to sustaining it. *Connor v. State*, 803 So. 2d 598, 605 (Fla. 2001). But we review determinations of probable cause de novo. *Id.* (citing *Ornelas v. United States*, 517 U.S. 690, 699 (1996)).

The Broad Scope of Analysis Under the Fourth Amendment

For many years, questions arising under the Fourth Amendment have generally been answered through examination of the totality of the circumstances. Indeed, decades ago the Supreme Court described that it had by that time already "long held that the 'touchstone of the Fourth Amendment is reasonableness,' " which "in turn, is measured in objective terms by examining the totality of the circumstances." *Ohio v. Robinette*, 519 U.S. 33, 39 (1996) (quoting *Florida v. Jimeno*, 500 U.S. 248, 250 (1991)); *see also United States v. Knights*, 534 U.S. 112, 122 (2001)

5

(observing that "our holding rests on ordinary Fourth Amendment analysis that considers all the circumstances of a search").

In repeatedly rejecting narrower analyses of few facts in isolation, the Court has explained that "[i]n applying this test we have consistently eschewed bright-line rules, instead emphasizing the fact-specific nature of the reasonableness inquiry." *Robinette*, 519 U.S. at 39. It has "expressly disavowed any 'litmus-paper test' or single 'sentence or . . . paragraph . . . rule,' in recognition of the 'endless variations in the facts and circumstances' implicating the Fourth Amendment." *Id.* (quoting *Florida v. Royer*, 460 U.S. 491, 506 (1983)). The Court has called such "bright-line" and "per se" rules to be "contrary to our 'traditional contextual approach,' " under which "the proper inquiry necessitates a consideration of 'all the circumstances surrounding the encounter.' " *Id.* (first quoting *Michigan v. Chesternut*, 486 U.S. 567, 572-73 (1988); and then quoting *Florida v. Bostick*, 501 U.S. 429, 439 (1991)).

Ultimately, in summing up the "variety of terms to capture the elusive concept of what cause is sufficient to authorize police to stop a person," the Court has explained:

> Terms like "articulable reasons" and "founded suspicion" are not self-defining; they fall short of providing clear guidance dispositive of the myriad factual situations that arise. <u>But the essence of all that has been written is that the totality of the circumstances—the whole picture—must be taken into account</u>. Based upon that whole picture the detaining officers must have a particularized and objective basis for suspecting the particular person stopped of criminal activity.

*United States v. Cortez,* 449 U.S. 411, 417-18 (1981) (emphasis added) (citing *Brown v. Texas,* 443 U.S. 47, 51 (1979); *United States v. Brignoni-Ponce,* 422 U.S. 873, 884 (1975)).

A Practical Exception

Even though the reasonableness of a search and seizure necessarily depends on all of the circumstances, over the years certain practical exceptions and heuristics have arisen that often permit law enforcement to conduct valid searches or seizures based on a few key, commonly-arising facts. One involves the "plain view" doctrine.

Thereunder, "if police are lawfully in a position from which they view an object, if its incriminating character is immediately apparent, and if the officers have a lawful right of access to the object, they may seize it without a warrant." *Dickerson*, 508 U.S. at 375. The rationale for this exception to the warrant requirement "is that if contraband is left in open view and is observed by a police officer from a lawful vantage point, there has been no invasion of a legitimate expectation of privacy and thus no 'search' within the meaning of the Fourth Amendment." *Id.*

Through "obvious application by analogy," the plain view doctrine has been extended to other senses beyond just sight. *Id.* This includes "cases in which an officer discovers contraband through the sense of touch during an otherwise lawful search." *Id.* It also applies to the sense of smell. *See United States v. Angelos*, 433 F.3d 738, 747 (10th Cir. 2006) (explaining that the plain smell doctrine "is simply a logical extension" of the longstanding plain view doctrine (collecting cases)).

Regardless of which sense of perception is involved, a core element of this doctrine is that law enforcement must "immediately" perceive the "incriminating character" of the item. *Dickerson*, 508 U.S. at 375; *see also Washington v. Chrisman*, 455 U.S. 1, 5-6 (1982) ("The 'plain view' exception to the Fourth Amendment warrant requirement permits a law enforcement officer to seize <u>what clearly is incriminating evidence or contraband</u> when it is discovered in a place where the officer has a right

7

to be." (emphasis added)). "Florida courts consistently have held that when closer examination of an item observed in plain view is necessary to confirm the incriminating nature of the contraband, its incriminating nature is not considered 'immediately apparent.' " *Sawyer v. State*, 842 So. 2d 310, 312 (Fla. 5th DCA 2003) (citing *Caplan v. State*, 531 So. 2d 88 (Fla. 1988); *Carr v. State*, 353 So. 2d 958 (Fla. 2d DCA 1978)).

Consequently, where "the police lack probable cause to believe that an object in plain view is contraband without conducting some further search of the object—*i.e.,* if 'its incriminating character [is not] "immediately apparent," '—the plain-view doctrine cannot justify its seizure." *Dickerson*, 508 U.S. at 375 (alteration in original) (emphasis added) (citation omitted) (quoting *Horton v. California*, 496 U.S. 128, 136 (1990)); *see also Cole v. State*, 727 So. 2d 280, 281 (Fla. 2d DCA 1999) (reversing denial of suppression and rejecting "plain feel doctrine" in the absence of testimony "that it was immediately apparent to" the arresting officer that a suspicious item was in fact contraband (emphasis added)).

Legislative Amendments to the Definition & Regulation of Cannabis

Last year, the Fifth District was called upon in *Baxter* to consider whether significant legislative amendments over the past decade had affected the probable cause analysis with respect to cannabis. In answering that question, the court conducted a detailed analysis of the history between cannabis and Fourth Amendment jurisprudence.

In *Baxter*, the Fifth District observed that as early as "the late 1960s, Florida courts recognized that because cannabis was illegal, its smell alone was sufficient to establish probable cause." 389 So. 3d at 809 (collecting cases). "This was appropriate because its odor was 'very distinctive,' and 'evidence in the plain smell may be detected without a warrant.' " *Id.* (first quoting *State v. T.T.*, 594 So. 2d 839, 840 (Fla. 5th

8

DCA 1992); and then quoting *Nelson v. State*, 867 So. 2d 534, 537 (Fla. 5th DCA 2004)).  Because its "incriminating character" was inherent and thus "immediately apparent" upon smelling the substance, there was no need for any further search by law enforcement in order to establish probable cause.  *Id.* (citing *Dickerson*, 508 U.S. at 375).

The Fifth District then discussed legislative changes at the state and federal level that have fundamentally altered the legal landscape regarding cannabis over the past decade, including by legalizing the substance in several defined circumstances.

In particular, the court observed that "[p]rior to the 2014 medical marijuana ballot initiative, 'cannabis' was broadly defined as 'all parts of any plant of the genus *Cannabis*, whether growing or not . . . and every compound, . . . derivative, mixture, or preparation of the plant or its seeds or resin.' "  *Id.* (quoting § 893.02(3), Fla. Stat. (2013)).

However, "[i]n 2017, the Legislature amended the definition of 'cannabis' to exclude 'marijuana' as defined in section 381.986, the statute regarding medical use of marijuana by a qualified patient."  *Id.* (citing § 893.02(3), Fla. Stat. (2017)).  Under the medical statute, "marijuana" retained the above definition, but now with the following additional element: "which are dispensed from a medical marijuana treatment center for medical use by a qualified patient."  *Id.* at 809-10 (quoting § 381.986(1)(f), Fla. Stat. (2021)).

The Fifth District also discussed the parallel legalization of hemp: "In December 2018, federal law changed to exclude hemp from the federal definition of marijuana."  *Id.* at 810 (citing 21 U.S.C. § 802(16)(B) (2018)).  Likewise, "[i]n July 2019, the Florida Legislature enacted the 'State hemp program.' "  *Id.* (citing § 581.217, Fla. Stat. (2019)).

9

Notably, "[i]ncluded in both the federal and Florida definition, 'hemp' is the plant Cannabis sativa L. and any part of that plant, that has a total delta-9-tetrahydrocannabinol ('Delta-9 THC') concentration that does not exceed 0.3 percent on a dry-weight basis." *Id.* (citing § 581.217(3)(e), Fla. Stat. (2023); 7 U.S.C. § 1639*o*(1) (2021)). By its plain language, this includes only plants that have a certain THC concentration by weight.

Under the State hemp program, "[h]emp-derived cannabinoids, including, but not limited to, cannabidiol, are not controlled substances or adulterants." *Id.* (alteration in original) (quoting § 581.217(2)(b), Fla. Stat. (2021)). In turn, "the Legislature specifically amended the Florida Comprehensive Drug Abuse Prevention and Control Act ('FCDAPCA') to exclude hemp from the definition of 'cannabis.' " *Id.* (citing § 893.02(3)).

The court further observed that "[s]mokable hemp was authorized in Florida beginning July 1, 2020." *Id.* at 810 n.4 (citing § 581.217, Fla. Stat. (2020)). "Unlike medical marijuana, there are no restrictions placed on smoking hemp in vehicles." *Id.* (citing § 581.217, Fla. Stat. (2021); *cf.* § 381.986(1)(j)(5)(f)). "The only restriction on the retail sale of hemp products that otherwise meet the requirements of section 581.217 is to individuals under the age of twenty-one." *Id.* (citing § 581.217(7)(d), Fla. Stat. (2024)).

Considering the cumulative effect of all of these legislative changes, the Fifth District explained:

> Because the Legislature dissected the cannabis plant when it legalized medical marijuana and hemp, the term "cannabis" for purposes of the FCDAPCA no longer has the same meaning it has had for decades. In other words, according to the plain language of the statute, if the cannabis is properly dispensed from a medical treatment center, then it is not a controlled substance. If the cannabis has a Delta-9 THC

10

concentration not exceeding 0.3 percent, it is likewise not a controlled substance.

*Id.* at 810 (emphasis added).

The court concluded that "[b]ased on these statutory changes, cannabis is legal in Florida when either it is dispensed from a medical marijuana treatment center for medical use, *see* § 381.986[(1)](g), Fla. Stat., or it is 'hemp,' which has a Delta-9 THC concentration not exceeding 0.3 percent on a dry-weight basis." *Id.* (citing § 581.217(3)(e); *Hatcher v. State*, 342 So. 3d 807, 810 n.3 (Fla. 1st DCA 2022)).

Addressing its duty to apply statutes as written, the court said "[t]hese statutory changes are significant and warrant both recognition and proper application by the courts." *Id.* (citing *Forsythe v. Longboat Key Beach Erosion Control Dist.*, 604 So. 2d 452, 454 (Fla. 1992)). "We are required to acknowledge and follow these explicitly defined terms." *Id.* (citing *Deloatch v. State*, 360 So. 3d 1165, 1169 (Fla. 4th DCA 2023) ("When a statute includes an explicit definition, [courts] must follow that definition, even if it varies from that term's ordinary meaning." (alteration in original) (quoting *Stenberg v. Carhart*, 530 U.S. 914, 942 (2000))))).

Accordingly, the Fifth District held: "The incremental legalization of certain types of cannabis at both the federal and state level has reached the point that its plain smell does not immediately indicate the presence of an illegal substance. As a result, the smell of cannabis cannot on its own support a detention." *Id.* at 810-11 (footnote omitted).

At the same time, the court recognized that "not <u>all</u> cannabis is legal, and that fact must be reflected in a Fourth Amendment analysis." *Id.* at 811. Thus, it clarified that "notwithstanding the statutory changes, the smell of cannabis may be a relevant, but not dispositive, factor to consider under the totality of the circumstances." *Id.* at 811-12.

11

Notably, in so concluding, the Fifth District acknowledged that "testimony that the smell of hemp and marijuana is indistinguishable has been presented in various Florida and federal courts without contradiction." *Id.* at 811 n.5. However, the court expressly <u>declined</u> to rely upon any such evidence or facts, emphasizing that its "analysis depends entirely on the statute and its definitions of 'cannabis,' 'marijuana,' and 'hemp.' " *Id.* Regardless of odor, " 'marijuana' and 'hemp' are both simply cannabis, and cannabis can be either legal or illegal based on its origin or THC pursuant to Florida statute." *Id.*

Applying its holding, the Fifth District concluded that the officer lacked a reasonable suspicion of criminal activity because there were no "circumstances that would have led a reasonable officer to believe that Baxter was unlawfully possessing cannabis <u>at the inception of the investigatory detention</u>." *Id.* at 812. When the detention began, the only basis was the smell of cannabis, which under the updated statutory language is no longer immediately apparent as incriminating without some further search. *See id.*; *see also Dickerson*, 508 U.S. at 375.

<u>Updating & Aligning the Fourth Amendment Analyses</u>

As the Fifth District recognized in *Baxter*, over a century ago the Florida Supreme Court explained the courts' obligation to apply unambiguous and constitutional statutes as written:

> The Legislative intent being plainly expressed, so that the act read by itself or in connection with other statutes pertaining to the same subject is clear, certain and unambiguous, <u>the courts have only the simple and obvious duty to enforce the law according to its terms</u>. . . . Even where a court is convinced that the Legislature really meant and intended something not expressed in the phraseology of the act, it will not deem itself authorized to depart from the plain meaning of the language which is free from ambiguity. If a Legislative enactment violates no constitutional provision or principle it

12

> must be deemed its own sufficient and conclusive evidence of the justice, propriety and policy of its passage. Courts have then no power to set it aside or evade its operation by forced and unreasonable construction. <u>If it has been passed improvidently the responsibility is with the Legislature and not the courts</u>.

*Forsythe*, 604 So. 2d at 454 (emphases added) (quoting *Van Pelt v. Hilliard*, 78 So. 693, 694-95 (Fla. 1918)) (collecting cases).

There has been no suggestion here that any of the relevant statutes are ambiguous or unconstitutional.[2] We are obligated under well-established constitutional principles to give meaning and effect to the legislature's significant amendments to cannabis regulation.

Upon doing so, we agree with *Baxter* to the extent it concludes that the significant legislative amendments to the definition and regulation of cannabis necessarily affect the Fourth Amendment analysis. Simply put, the legislature fundamentally changed the very definition of the substance in a way that renders some of the jurisprudence that properly applied under the predecessor statutes distinguishable. That redefinition necessarily has downstream effects on the constitutional analysis for involuntary searches and seizures for suspected possession.

In particular, by defining and legalizing discrete forms of cannabis on bases that are manifestly not discernable by smell—such as how it was procured—the mere odor of cannabis standing alone no longer can

---

[2] Likewise, neither party contends that Mr. Williams' status as a probationer is relevant to this issue. That is consistent with the record, which reflects a lack of any conditions of probation that affected his rights against searches or seizures by anyone other than his probation officer, who was not involved here. *See, e.g., Grubbs v. State*, 373 So. 2d 905, 909 (Fla. 1979) (explaining that while probation officers may search probationers without a warrant, "granting such general authority to law enforcement officials is not permissible under the search and seizure provisions of the Florida or United States Constitutions").

make it clearly or immediately apparent that the substance is contraband without conducting some further search. *See Dickerson*, 508 U.S. at 375; *Chrisman*, 455 U.S. at 5-6; *Cole*, 727 So. 2d at 281. In such circumstances, the jurisprudence is well settled that "the plain-view doctrine cannot justify its seizure." *Dickerson*, 508 U.S. at 375. The same must apply to the doctrine's extension to the sense of smell.

Notably, this analysis aligns the treatment of cannabis with other suspected contraband. In particular, with respect to pills, Florida law is well settled that an officer's inability to immediately identify them as incriminating likewise precludes application of the plain view doctrine. *See, e.g., Gay v. State*, 138 So. 3d 1106, 1109 (Fla. 2d DCA 2014) (reversing denial of suppression where "neither the illegal nature of the possession of the pills nor the type of pills was known to the officer at the time he removed them from the vehicle"); *State v. Deaton*, 109 So. 3d 338, 339 (Fla. 4th DCA 2013) (affirming suppression on the basis that "there was nothing in and of itself in terms of the nature of the pill and how the pill was being carried on [the defendant's] person that gave [the detective] probable cause to arrest for the felony" (second alteration in original)); *Smith v. State*, 95 So. 3d 966, 969 (Fla. 1st DCA 2012) (reversing denial of suppression where "the incriminating nature of the pills was not immediately apparent to the deputy such that he had probable cause to seize the bag under the plain-view doctrine"); *Sawyer*, 842 So. 2d at 312 (reversing denial of suppression where "the incriminating character of the pill was not 'immediately apparent' "). Just like with pills, the legality of cannabis possession under the updated legislation now depends on discrete characteristics such as its chemical composition and method of procurement.

We hasten to emphasize, as the *Baxter* majority did, that our holding merely eliminates a narrow exception to the warrant requirement that authorized involuntary searches and seizures based only on a single fact. Some cannabis remains illegal, which is indisputably a relevant factor to consider among the totality of the circumstances. We simply hold that the odor of cannabis is no longer independently dispositive.

In light of our holding, we recede from our precedent to the extent that it holds that the legislative amendments surrounding cannabis do not affect the Fourth Amendment analysis and that its smell alone is sufficient for probable cause. *See Owens*, 317 So. 3d at 1219-20.

<u>This Case</u>

Generally, where law enforcement conducts an involuntary detention without sufficient justification, suppression is appropriate under the exclusionary rule. *See, e.g.*, *Carter*, 389 So. 3d at 765 (reversing denial of suppression where officers lacked reasonable suspicion for investigatory stop). But exceptions exist, including circumstances "when the police conduct a search in objectively reasonable reliance on binding appellate precedent." *Davis v. United States*, 564 U.S. 229, 249-50 (2011). Because suppression would "deter[] no police misconduct and impose[] substantial social costs" in such cases, "the exclusionary rule does not apply." *Id.*

Here, *Owens* was the law in our district at the time of Mr. Williams' arrest, and it expressly permitted the search based solely on the odor of cannabis. Thus, by following *Owens*, law enforcement was acting in objectively reasonable reliance on binding appellate precedent. We therefore affirm the revocation in this case. *See Baxter*, 389 So. 3d at 812-13 (citing *Davis*, 564 U.S. at 249).

However, there is a scrivener's error in the revocation order. Even though it is undisputed that Mr. Williams did not admit to any violations, the court expressly found that he did. Thus, we remand the revocation order for correction. *See, e.g., Caldwell v. State*, 72 So. 3d 779, 779-80 (Fla. 2d DCA 2011) (remanding for correction of scrivener's error incorrectly stating the defendant admitted violating probation when in fact the court found a violation after a contested hearing).

Certified Question

Given the impact that our holding will have on searches and seizures within our district, we certify the following question of great public importance to the Florida Supreme Court pursuant to Florida Rule of Appellate Procedure 9.030(a)(2)(A)(v):

> DOES THE PLAIN SMELL DOCTRINE CONTINUE TO APPLY TO ESTABLISH PROBABLE CAUSE BASED ONLY ON THE ODOR OF CANNABIS?

## CONCLUSION

In light of significant legislative amendments to the definition and regulation of cannabis, its mere odor can no longer establish that it is "immediately apparent" that the substance is contraband. Accordingly, the plain smell doctrine can no longer establish probable cause based solely on the odor of cannabis. Rather, we now align the Fourth Amendment analysis for cannabis with the test that applies to other suspected contraband, such that its odor is a valid factor to be considered along with all others under the totality of the circumstances.

Revocation affirmed; question certified; remanded for correction of scrivener's error.

16

LUCAS, C.J., NORTHCUTT, SILBERMAN, MORRIS, BLACK, SLEET, ROTHSTEIN-YOUAKIM, SMITH, and LABRIT, JJ., Concur.
KELLY, J., Concurs in result only.
ATKINSON, J., Concurs with opinion.
LaROSE, J., Concurs with opinion in which NORTHCUTT, SILBERMAN, KELLY, and KHOUZAM, JJ., Concur.
VILLANTI, J., Dissents with opinion in which MOE, J., Concurs.
MOE, J., Concurs in part and Dissents in part with opinion in which VILLANTI, J., Concurs.

ATKINSON, Judge, Concurring.

I agree with the majority that the smell of cannabis in isolation cannot trigger the plain smell doctrine. That is, it is no longer immediately apparent that the odor of cannabis, without more, is indicative of criminal activity. I also agree with the majority's decision to affirm because the exclusionary rule does not apply under the circumstances of this case. I write separately to more fully address the parties' arguments regarding whether the odor of cannabis in isolation could establish probable cause under the circumstances of this case even if the criminal nature of its source is not immediately apparent.

**I.**

As the majority observes, the plain smell doctrine is a "logical extension" of the plain view doctrine. *United States v. Angelos*, 433 F. 3d 738, 747 (10th Cir. 2006). "Under that doctrine, if police are lawfully in a position from which they view an object, if its incriminating character is immediately apparent, and if the officers have a lawful right of access to the object, they may seize it without a warrant." *Minnesota v. Dickerson*, 508 U.S. 366, 375 (1993). "The rationale of the plain-view

17

doctrine is that if contraband is left in open view and is observed by a police officer from a lawful vantage point, there has been no invasion of a legitimate expectation of privacy and thus no 'search' within the meaning of the Fourth Amendment . . . ." *Id.*; *see also, e.g., Carpenter v. United States*, 585 U.S. 296, 304 (2018) ("When an individual 'seeks to preserve something as private,' and his expectation of privacy is 'one that society is prepared to recognize as reasonable,' we have held that official intrusion into that private sphere generally qualifies as a search and requires a warrant supported by probable cause." (quoting *Smith v. Maryland*, 442 U.S. 735, 740 (1979))). In other words, because no "search" has occurred when the plain view doctrine applies, the Fourth Amendment is not even implicated. *See Dickerson*, 508 U.S. at 375.

Given its origin as a logical extension of the plain view doctrine, one might expect that the plain smell doctrine is premised on a similar rationale in that it does not implicate a search within the meaning of the Fourth Amendment. In other words, a law enforcement officer does not conduct a search when he or she is lawfully located in a position to smell an object, he or she has a lawful right of access to the object, and the incriminating nature of the odor is immediately apparent.

However, this court and other courts of this state have analyzed the plain smell doctrine in terms of whether an odor of an apparent incriminating nature establishes probable cause *for a search*. *See, e.g., Owens v. State*, 317 So. 3d 1218, 1219 (Fla. 2d DCA 2021) (concluding that law enforcement had probable cause to search a vehicle "based solely on the odor of marijuana"); *Ford v. State*, 400 So. 3d 838, 844 (Fla. 5th DCA 2025) (concluding that because "whether the substance [the police dog] smelled was legal or illegal was not readily apparent," law enforcement lacked "probable cause to justify the warrantless search of"

18

a vehicle); *State v. J.J.*, 143 So. 3d 1050, 1052 (Fla. 4th DCA 2014) ("A police officer 'who is trained to recognize the odor of marijuana and who is familiar with it and can recognize it has probable cause, based on the smell alone, to search a person or a vehicle for contraband.' " (quoting *State v. T.T.*, 594 So. 2d 839, 840 (Fla. 5th DCA 1992))); *State v. Williams*, 967 So. 2d 941, 942 (Fla. 1st DCA 2007) ("We conclude that under well-settled Florida law, the detection by a police officer of the odor of burnt cannabis emanating from a vehicle, by itself, constitutes sufficient 'facts and circumstances' to establish probable cause to search the person of an occupant of that vehicle.").

That conception of the plain smell doctrine presumes that the odor itself does not justify a warrantless *seizure* of evidence, as is the case when the plain view doctrine is applicable, but rather that the odor itself may justify a further search for, and seizure of, the object emitting the odor.[3] *See Texas v. Brown*, 460 U.S. 730, 738–39 (1983) (" 'Plain view' is perhaps better understood, therefore, not as an independent 'exception' to the warrant clause, but simply as an extension of whatever the prior justification for an officer's 'access to an object' may be."). The seeming

---

[3] Perhaps that distinction is because the plain smell doctrine serves dual purposes—or perhaps even has two meanings. On one hand, it could provide that an officer's smell of an incriminating odor is not a search that implicates the Fourth Amendment. And on the other hand, it could provide that the incriminating information gained from the mere smell of that odor may be sufficient to establish probable cause to conduct a further search of, for example, a person, a house, or an automobile. As a practical matter, an officer's smell of an odor indicative of criminal activity is generally what precipitates a search to find the object emitting that odor, whereas the plain view doctrine often "does not occur until a search is in progress" and "serves to supplement the prior justification" for the search in progress, *Coolidge v. New Hampshire,* 403 U.S. 443, 466–67 (1971).

19

incongruity[4] could be attributed to the fact that the Supreme Court has incorporated the concept of probable cause into the plain view doctrine, eliding the distinction between the concepts of immediate apparency and probable cause. *See id.* at 741–42 (recognizing that "[p]lainly, the [United States Supreme] Court d[oes] not view the 'immediately apparent' language . . . as establishing any requirement that a police officer 'know' that certain items are contraband or evidence of a crime," but rather "that '[t]he seizure of property in plain view involves no invasion of privacy and *is presumptively reasonable, assuming that there is probable cause to associate the property with criminal activity*' " (third alteration in original) (quoting *Payton v. New York*, 445 U.S. 573, 587 (1980))); *see also Dickerson*, 508 U.S. at 375 ("If, however, the police lack probable cause to believe that an object in plain view is contraband without conducting some further search of the object—*i.e.*, if its incriminating character [is not] immediately apparent, the plain-view doctrine cannot justify its seizure." (alteration in original) (quotation marks omitted) (citation omitted) (first quoting *Horton v. California*, 496 U.S. 128, 136

---

[4] Probable cause is generally what authorizes a search or seizure to occur, so if no search has occurred, then no probable cause should be needed. As such, incorporating probable cause into a doctrine premised upon the rationale that no search has occurred presents an ostensible paradox. Additionally, probable cause means a "fair probability" or "substantial chance" that "contraband or evidence of a crime will be found in a particular place." *Illinois v. Gates*, 462 U.S. 213, 238, 243 n.13 (1983). But if the incriminating nature of a particular object is "immediately apparent," it is obvious that the object is evidence of criminal activity and there are necessarily no probabilities involved in that assessment. *See, e.g., Apparent*, American Heritage Dictionary, https://ahdictionary.com/word/search.html?q=apparent (last visited Sept. 16, 2025) (defining "apparent" as "[r]eadily understood; clear or obvious"). Under those circumstances, it would seem to be a foregone conclusion that probable cause exists.

(1990); and then citing *Arizona v. Hicks*, 480 U.S. 321, 326 (1987)));
*Maryland v. Buie*, 494 U.S. 325, 330 (1990) ("There is also no dispute
that if Detective Frolich's entry into the basement was lawful, the seizure
of the red running suit, which was in plain view and which the officer
had probable cause to believe was evidence of a crime, was also lawful
under the Fourth Amendment."); *Hicks*, 480 U.S. at 426 ("We have not
ruled on the question whether probable cause is required in order to
invoke the 'plain view' doctrine. . . . We now hold that probable cause is
required.").

But because probable cause indicates a lower threshold for law
enforcement action as contrasted with whether the incriminating nature
of an object is "immediately apparent," it is worthwhile to scrutinize this
case through the lens of the former as well as the latter. The majority
understandably, and correctly, addresses case law elucidating the plain
view and plain smell doctrines as that decisional authority comes before
us. However, beyond analyzing whether the incriminating nature of the
odor of cannabis is immediately apparent, it is important in light of other
existing case law and the arguments advanced by the State, to more fully
address the asserted justification of the search under a traditional
probable cause analysis.

## II.

The Fourth Amendment provides that

> [t]he right of the people to be secure in their persons, houses,
> papers, and effects, against unreasonable searches and
> seizures, shall not be violated, and no Warrants shall issue,
> but upon probable cause, supported by Oath or affirmation,
> and particularly describing the place to be searched, and the
> persons or things to be seized.

Amend. IV, U.S. Const. Though the Fourth Amendment refers to
probable cause as a prerequisite for the issuance of a warrant, the

21

Supreme Court has also established probable cause as the prerequisite for a warrantless search of an automobile, a recognized exception to the warrant requirement. *See Collins v. Virginia*, 584 U.S. 586, 591–92 (2018) (explaining that due to the "ready mobility" and "pervasive regulation" of automobiles, "the search of an automobile can be reasonable without a warrant" when officers "have probable cause to do so" (quoting *California v. Carney*, 471 U.S. 386, 392 (1985))).

The question of whether there was probable cause in this case must begin with the question of what "probable cause" means in the context of the Fourth Amendment. *See Gamble v. United States*, 587 U.S. 678, 726 (2019) (Thomas, J., concurring) ("Our judicial duty to interpret the law requires adherence to the original meaning of the text."); *City of Tallahassee v. Fla. Police Benevolent Ass'n*, 375 So. 3d 178, 183 (Fla. 2023) ("[W]e give the words of the constitution their plain, usual, ordinary, and commonly accepted meanings at the time they were written."). The "Constitution was written to be understood by the voters; its words and phrases were used in their normal and ordinary as distinguished from technical meaning." *District of Columbia v. Heller*, 554 U.S. 570, 576 (2008) (quoting *United States v. Sprague*, 282 U.S. 716, 731 (1931)). As such, courts should apply the ordinary meaning of the words used unless the context furnishes a valid reason to apply a different meaning. *See Advisory Op. to Governor re Implementation of Amend. 4, the Voting Restoration Amend.*, 288 So. 3d 1070, 1078 (Fla. 2020) ("[E]very word employed in the constitution is to be expounded in its plain, obvious, and common sense, unless the context furnishes some ground to control, qualify, or enlarge it." (alteration in original) (quoting Joseph Story, *Commentaries on the Constitution of the United States* 157–58 (1833))).

Because "the meaning of constitutional text is fixed at the time of its ratification," courts should endeavor to apply the ordinary meaning that existed at that time. *See United States v. Rahimi*, 602 U.S. 680, 737 (2024) (Barrett, J., concurring) ("Ratification is a democratic act that renders constitutional text part of our fundamental law . . . ." (citing Arts. V, VII, U.S. Const.)); *Planned Parenthood of Sw. & Cent. Fla. v. State*, 384 So. 3d 67, 77 (Fla. 2024) ("[W]e ask how the public would have understood the meaning of the text in its full context when the voters ratified it."). One way that courts often ascertain the ordinary meaning of words is by consulting dictionaries because, "in general, a dictionary may provide the popular and common-sense meaning of terms presented to the voters." *Advisory Op. Governor re Implementation of Amend. 4*, 288 So. 3d at 1078 (quoting *Advisory Op. to Att'y Gen. re Use of Marijuana for Certain Med. Conditions*, 132 So. 3d 786, 800 (Fla. 2014)); *see also Planned Parenthood*, 384 So. 3d at 77 (confirming the role of dictionaries to answer the "question of public meaning"). And because the meaning of a legal text is fixed at the time of enactment or ratification, *cf. Rahimi*, 602 U.S. at 737 (Barrett, J., concurring), it is important to consult dictionaries published in temporal proximity to the text at issue, *see, e.g., Consumer Fin. Prot. Bureau v. Cmty. Fin. Servs. Ass'n*, 601 U.S. 416, 427 (2024) (consulting dictionaries published in the late 1700s and early 1800s to ascertain the ordinary meaning of "appropriation" at "the time the Constitution was ratified"); *see also* Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 419 (2012) (explaining that "[d]ictionaries tend to lag behind linguistic realities—so a term now known to have first occurred in print in 1900 might not have made its way into a dictionary until 1950 or even 2000").

Dictionaries published in relatively close temporal proximity to the ratification of the Fourth Amendment provided that the meaning of the word "probable" was that a particular proposition was "[l]ikely" to be true in that it was supported by a preponderance of available evidence. *See, e.g.,* Noah Webster, *Probable,* American Dictionary of the English Language (1st ed. 1828), https://webstersdictionary1828.com/Dictionary/probable (last visited Sept. 16, 2025) (defining "probable" as "[l]ikely; having more evidence than the contrary, or evidence which inclines the mind to belief, but leaves some room for doubt"); Samuel Johnson, *Probable,* A Dictionary of the English Language (1773 ed.), https://johnsonsdictionaryonline.com/views/search.php?term=probable (last visited Sept. 16, 2025) (defining "probable" as "[l]ikely; having more evidence than the contrary"). So, at least according to the relatively contemporaneous sources cited above, the ordinary meaning of probable was that something was *likely*—that is, that the indications supporting the proposition outweighed reasons to believe "the contrary." *See id.*; *see also* Webster, *supra,* https://webstersdictionary1828.com/Dictionary/likely (last visited Sept. 16, 2025) (defining "likely" as "[p]robable; that may be rationally thought or believed to have taken place in time past, or to be true now or hereafter; such as is more reasonable than the contrary"); Johnson, *supra,* https://johnsonsdictionaryonline.com/views/search.php?term=likely (last visited Sept. 16, 2025) (defining "likely" as "[p]robable; such as may in reason be thought or believed; such as may be thought more reasonably than the contrary").

Based on that understanding of the term "probable," if the indicia supporting two competing propositions are at equipoise, it cannot be said that one of those propositions is probable; one proposition cannot be said to be more likely than the other or supported by more evidence than the contrary proposition. For example, when a friend indicates that he or she will *probably* attend your dinner party, you do not infer that his or her attendance is merely possible or subject to random chance. Rather, you infer that your friend believes it is *likely* that he or she will make it to the event—that is, it is more likely that your friend will be in attendance than miss the party. When, on the other hand, available evidence provides no indication that one possibility is more likely than another—when the indicia are at equipoise—it makes no sense to utilize the word "probable" to describe either possibility.

Based on the recent legislative changes in Florida regarding medical marijuana and hemp described in the majority opinion and the testimony adduced at the suppression hearing in this case, it was equally likely that the odor of cannabis indicated Mr. Williams had been engaging in criminal activity as it did noncriminal activity. That is, the State adduced no testimony or evidence to indicate that the odor—which could indicate either—was more likely to have emanated from an illegal source than a legal source. Further observation or additional information or experience would be necessary to resolve that question. Under such circumstances, it cannot be said that law enforcement's cause to believe that evidence of a crime would be found in the vehicle was *probable* given the ordinary meaning of that term, which at the time the Fourth Amendment was ratified appeared to connote a *likelihood*, not a coin toss or a mere guess.

25

According to a fair reading of the text of the Fourth Amendment based on the ordinary meaning of its terms, because it was no more likely that the odor was that of an illicit substance than it was of a legal substance, it would be difficult to reasonably say that it was *probable* that it was the former. An officer's belief under such circumstances would be a guess based on a *possibility*, not a reasonable belief in a *probability*. However, Florida courts are not necessarily at liberty to confine their analysis of the Fourth Amendment (nor the Florida Constitution's similar provision, *see* art. I, § 12, Fla. Const.) to a fair reading of the text alone. This court is bound by Supreme Court precedent construing the meaning of the Fourth Amendment. *See, e.g., Carnival Corp. v. Carlisle*, 953 So. 2d 461, 465 (Fla. 2007) (providing that "state courts are bound by the decisions of the United States Supreme Court construing federal law" (quoting *Chesapeake & Ohio Ry. Co. v. Martin*, 283 U.S. 209, 221 (1931))). And given the "conformity" clause in Article I, Section 12, of the Florida Constitution, the meaning of "probable cause" as it is used in the Florida Constitution must be "construed in conformity" with the Fourth Amendment as interpreted by the Supreme Court. *See* art. I, § 12, Fla. Const.; *Soca v. State*, 673 So. 2d 24, 27 (Fla. 1996) (providing that in light of the Florida Constitution's conformity clause, Florida courts "are bound to follow the interpretations of the United States Supreme Court with respect to the Fourth Amendment and provide Florida Citizens no greater protection than those interpretations").

The United States Supreme Court has on several occasions rejected descriptions of probable cause consistent with an understanding of the meaning of the word *probable* to indicate a *likelihood*—that there is "more evidence" indicating criminality "than the contrary," *see* Johnson, *supra.*

26

The United States Supreme Court has explicitly repudiated the rationale that probable cause is tantamount to a *more likely than not* standard. *See Brown*, 460 U.S. at 742 ("[Probable cause] merely requires that the facts available to the officer would 'warrant a man of reasonable caution in the belief' that certain items may be contraband or stolen property or useful as evidence of a crime; it does not demand any showing that such a belief be correct or more likely true than false." (citation omitted)); *see also Florida v. Harris*, 568 U.S. 237, 243 (2013) ("The test for probable cause is not reducible to 'precise definition or quantification.' 'Finely tuned standards such as proof beyond a reasonable doubt or by a preponderance of the evidence . . . have no place in the [probable-cause] decision.' " (alteration in original) (citations omitted)); *Maryland v. Pringle*, 540 U.S. 366, 371 (2003) ("The probable-cause standard is incapable of precise definition or quantification into percentages because it deals with probabilities and depends on the totality of the circumstances.").

Thus, it appears clear that the United States Supreme Court has read the term "probable" in the context of the Fourth Amendment to mean something less than that term might ordinarily be understood in other contexts. But even under the precedent this court is constitutionally obligated to follow, the existence of probable cause still requires more than a mere *possibility* that evidence of a crime will be found in the place to be searched. In its context in the Fourth Amendment, the phrase "probable cause" cannot be based on a mere possibility without contorting the meaning of the word "probable" far more violently than any United States Supreme Court opinion could conceivably require. Probable cause requires a "practical, common-sense decision whether, given all the circumstances . . . , there is a fair probability that contraband or evidence of a crime will be found in a

27

particular place." *Gates*, 462 U.S. at 238. Stated differently, there must be a "substantial chance of criminal activity." *Id.* at 243 n.13. And the conclusion that such a chance of criminal activity is substantial must be based on objective criteria, not merely a guess based on evidence supporting a *possibility* of such activity. *See District of Columbia v. Wesby*, 583 U.S. 48, 54 n.2 (2018) (recognizing that probable cause is an "objective standard"); *Durruthy v. Pastor*, 351 F.3d 1080, 1092 (11th Cir. 2003) (listing the "objective facts" that established probable cause); *Hawxhurst v. State*, 159 So. 3d 1012, 1013 (Fla. 3d DCA 2015) (recognizing that probable cause "is grounded upon a standard of objective reasonableness"); *Bender v. State*, 737 So. 2d 1181, 1182 (Fla. 1st DCA 1999) ("Because the objective evidence in the record was sufficient to establish probable cause for the instant traffic stop, we affirm."); *cf. Brown v. Texas*, 443 U.S. 47, 52 (1979) (reasoning that reasonable suspicion must be "based on objective criteria"). Without such objective criteria, deducing criminality from an odor that could just as easily indicate lawful hemp as it could indicate an unlawful form of cannabis might better be described as merely a "hunch," which does not qualify as a "substantial chance" of the latter for the purpose of establishing probable cause. *Cf. Perez v. Tony*, 383 So. 3d 525, 532 (Fla. 4th DCA 2024) (providing that law enforcement's " 'hunch' or 'mere suspicion' d[id] not equate to probable cause"). The hunches of experienced and skilled law enforcement officers are no doubt valuable and not to be blithely ignored. But under the Constitution and Supreme Court case law, they cannot form the sole basis for a search that implicates the Fourth Amendment.

Based on what the State has presented in this case, the recent legislation legalizing activity involving certain forms of cannabis and

hemp forecloses the finding of probable cause based on the smell of such substances alone. However, this is not to suggest that law enforcement must rule out the possibility of such lawful activity when evaluating the existence of probable cause. *See Wesby*, 583 U.S. at 61 ("[P]robable cause does not require officers to rule out a suspect's innocent explanation for suspicious facts."). It is well established that "innocent behavior frequently will provide the basis for a showing of probable cause" that a crime has been committed. *Gates*, 462 U.S. at 243 n.13. The point is that considering recent legislation, "the degree of suspicion that attaches to" the odor of cannabis, *without more*, does not give rise to a "substantial chance of criminal activity." *Id.* ("In making a determination of probable cause the relevant inquiry is not whether particular conduct is 'innocent' or 'guilty,' but the degree of suspicion that attaches to particular types of non-criminal acts."). What "degree of suspicion" attaches to the mere odor of cannabis? *See id.* If an officer has no indicia other than the odor itself, and nothing from which the officer could reasonably infer that the odor is emanating from an illegal form of cannabis, then the degree of suspicion that attaches cannot be very high. While such an officer's curiosity about the *possibility* that he might be smelling something other than the legal variety of cannabis is understandable, the odor alone does not establish probable cause under the Fourth Amendment's prohibition on unreasonable searches and seizures.

To illustrate, it is helpful to compare *Kansas v. Glover*, 589 U.S. 376 (2020), with *State v. Teamer*, 151 So. 3d 421 (Fla. 2014), both of which involved an investigatory stop based on a single, observed fact but resulted in different outcomes. In *Glover*, the Supreme Court concluded that a police officer had reasonable suspicion for an investigatory stop

29

after learning that the registered owner of a vehicle had a revoked driver's license. 589 U.S. at 378. The basis of the Supreme Court's decision was that the officer drew a "commonsense inference that [the owner] was likely the driver of the vehicle" and lacked any information to negate that inference. *Id.* at 378, 381. Supporting this inference were "[e]mpirical studies demonstrat[ing] what common experience readily reveals[—d]rivers with revoked licenses frequently continue to drive"— and the common sense rationale that "drivers who have already demonstrated a disregard for the law or are categorically unfit to drive" under Kansas law are not unlikely to flout the law yet again and therefore "may continue driving" despite the illegality of that conduct and the risk of criminal sanction in the event of interdiction by law enforcement. *Id.* at 381–82. The Supreme Court reasoned that the "fact that the registered owner of a vehicle is not always the driver of the vehicle does not negate the reasonableness of [that] inference" because "[s]uch is the case with all reasonable inferences." *Id.* at 381; *see also Thomas v. State*, 312 So. 3d 156, 158 (Fla. 1st DCA 2021) (rejecting the argument that law enforcement "lacked reasonable suspicion to conduct a traffic stop based solely on the fact that the vehicle had a dealer tag that was not assigned to that vehicle" because other circumstances indicated the vehicle was not "connected to a dealership," such as that law enforcement observed the vehicle at a gas station around midnight and the vehicle was registered to an individual in another city).

In *Teamer*, the Florida Supreme Court concluded that law enforcement lacked reasonable suspicion for an investigatory traffic stop based solely on the fact that the officer observed the defendant driving a bright green Chevrolet vehicle when the vehicle was registered as a blue Chevrolet (the "database did not return any information regarding the

30

model of the vehicle"). 151 So. 3d at 424, 427–28. Framing the issue as "what degree of suspicion attaches" to the defendant's act, the court rejected the argument that law enforcement could draw a reasonable inference based solely on the color discrepancy that the vehicle was stolen or the license tag had been illegally transferred. *Id.* at 427–28, 430. The court reasoned that the officer "needed more indicia of a violation to distinguish between an illegal transfer of license plates, for example, and a legal decision to paint one's vehicle." *Id.* at 430. Given the absence of such indicia, "the government provided no evidence to tip the scales from a mere hunch to something even approaching reasonable and articulable suspicion" of criminal activity. *Id.* at 428 (quoting *United States v. Uribe*, 709 F.3d 646, 652 (7th Cir. 2013)).

*Glover* and *Teamer* both involved reasonable suspicion, not probable cause, but are nonetheless instructive. Notably, the predicate for reasonable suspicion is "obviously less than is necessary for probable cause" because it is a "less demanding" standard. *Glover*, 589 U.S. at 380 (first quoting *Prado Navarette v. California*, 572 U.S. 393, 397 (2014); and then quoting *Alabama v. White*, 496 U.S. 325, 330 (1990)). As the seizure in *Teamer* was unjustified by a reasonable suspicion, the search in this case was unjustified by the probable cause necessary to comply with the Constitution. Like this case, in which the officers were confronted with two possibilities—an odor that could be emanating from illegal or legal cannabis—the officers in *Glover* and *Teamer* were presented with competing theoretical explanations for the phenomena they were observing. In *Glover*, the individual driving the vehicle could have been the registered owner driving with a revoked license or could have been some other individual such as a family member who had borrowed the vehicle. In *Teamer*, the vehicle could have been a different

31

color because the driver merely repainted it or because the driver illegally transferred the license tag from the vehicle to which it was assigned. The difference in the outcomes of those cases was the reasonableness—or lack thereof—of the inference that it was the unlawful act rather than the lawful act. In *Glover*, the Supreme Court pointed to other indicia supporting the commonsense inference that it was the registered owner driving the vehicle, including statistical evidence. And given the reasonableness of that inference—based on common experience, common sense, and evidence in the record—there was no valid reason to discount the likelihood that the registered owner was driving the car in violation of the law despite the possibility of an innocent alternative. In *Teamer*, by contrast, the court pointed to the absence of a common-sense basis to draw the inference that the color discrepancy indicated criminal activity. *See Teamer*, 151 So. 3d at 428 ("The law allows officers to draw rational inferences, but to find reasonable suspicion based on this single noncriminal factor would be to license investigatory stops on nothing more than an officer's hunch."); *cf. Baxter v. State*, 389 So. 3d 803, 812 (Fla. 5th DCA 2024) (en banc) ("To justify a detention, there must be some *context or* other factors that, in combination with the potentially lawful activity, creates reasonable suspicion." (emphasis added)).

The opinions in *Glover* and *Teamer* have at times been construed by appellate jurists as having decided whether a single, possibly noncriminal factor can justify an investigatory stop. *See Teamer*, 151 So. 3d at 433 (Canady, J., dissenting) (criticizing the majority for applying a "categorical rule" that "an officer's reliance on a 'single noncriminal factor'—such as the vehicle color discrepancy here—is the equivalent of a 'hunch' "); *Baxter*, 389 So. 3d at 820 (MacIver, J., concurring in result) ("As a matter of Florida precedent, though, *Teamer* does stand for the

premise that a single, possibly noncriminal factor cannot be the sole basis for a *Terry* stop. That premise, however, appears to be in direct conflict with *Glover*, . . . [which] held the opposite."); *cf. Kilburn v. State*, 297 So. 3d 671, 675 (Fla. 1st DCA 2020) (citing no authority in support of the assertion that a "potentially lawful activity cannot be the sole basis for a detention"). Respectfully, that recapitulation of the reasoning of *Glover* and *Teamer* is difficult to square with the professed rationale of those opinions. A fair reading of those opinions indicates that the courts in *Glover* and *Teamer* decided whether *enough* suspicion attached to the potentially noncriminal act such that a stop could be conducted in compliance with the Fourth Amendment—not that the innocent nature of the observed conduct was itself determinative of the constitutionality of the stop. In other words, the courts decided whether the degree of suspicion was high enough to establish a *reasonable* suspicion of criminal activity for purposes of conducting an investigatory stop despite the possibility of a countervailing, innocent theory. And the courts resolved that question by examining the nature of the act and the reasonableness of the inferences that the act did or did not support. Such an analysis would have been unnecessary if the sheer possibility that the act could be noncriminal was dispositive.

Like the color of the vehicle in *Teamer*, any inference of criminal activity derived solely from the odor of cannabis in this case was based on speculation alone—a theoretical possibility that the occupants of the vehicle were flouting the law when they could just as easily have been complying with the law. "[C]ommon sense" does not "suffice[] to justify this inference." *Glover*, 589 U.S. at 382. There are simply no facts in the record, nor any reasonable inferences to be drawn from any such facts, to indicate whether the odor of cannabis alone indicated that Mr.

33

Williams had been engaging in criminal or noncriminal activity. All the State adduced was the subjective conjecture that he was engaging in the former. *Cf. Wesby*, 583 U.S. at 54 n.2 (recognizing that probable cause is an "objective standard").

To be clear, the conclusion in this case that the officers did not have probable cause to search the vehicle does not rely on a perception that the odor of cannabis is potentially noncriminal, that is, that law enforcement was required to rule out innocent conduct; the proposition that probable cause can never arise when the indicia of legality and illegality are at equipoise or when there is merely a 50-50 chance that the cannabis producing the odor is in an illegal form; or a categorical rule that probable cause or reasonable suspicion cannot be based solely on one or more noncriminal factors. Rather, the conclusion is in answer to the question of what "degree of suspicion . . . attaches to" a single, potentially innocent fact like the odor of cannabis and whether, given all the information and experience available to the officer, the odor indicates a "substantial chance" that the cannabis is illegal. *Gates*, 462 U.S. at 243 n.13. On the record before us, there is nothing supporting the proposition that such a chance was "substantial" or that the "degree of suspicion" was anything more than speculative. *Id.*

### III.

In his separate opinion, Judge Villanti focuses on the dangers of impaired driving. He expresses a concern that this court's decision will increase the difficulty and reduce the effectiveness of law enforcement's efforts to interdict those who operate vehicles on public roadways while under the influence of cannabis. His concerns about the safety of the state's roadways are understandable, and it would be difficult to gainsay his prediction that this court's decision might pose an increased

34

challenge to the ability of law enforcement officers to ensure that those roadways are only traversed by "sober and safe drivers." But notwithstanding the reasonableness of Judge Villanti's concerns about the use of cannabis in any form inside a vehicle, the legislature has seen fit to permit possession *and smoking* of certain forms of cannabis *within vehicles*. As such, Judge Villanti's accurate observation that the statute authorizing *medical use* of marijuana does not permit such use in a vehicle "except for low-THC cannabis not in a form for smoking" is a red herring. *See* § 381.986(1)(k)5.f, Fla. Stat. (2023). Judge Villanti is correct to observe that medical marijuana users are not permitted to engage in medical use of marijuana by smoking it in a vehicle. *See id.* Indeed, medical marijuana use in a vehicle is prohibited even in a non-smokable form unless it is the low-THC variety. *See* § 381.986(12)(c) ("A qualified patient who uses marijuana, not including low-THC cannabis, . . . in . . . a vehicle . . . commits a misdemeanor of the first degree . . . ."); *see also* § 381.986(1)(f) (" 'Low-THC cannabis' means a plant of the genus *Cannabis*, the dried flowers of which contain 0.8 percent or less of tetrahydrocannabinol and more than 10 percent of cannabidiol weight for weight; the seeds thereof; the resin extracted from any part of such plant; or any compound, manufacture, salt, derivative, mixture, or preparation of such plant or its seeds or resin that is dispensed from a medical marijuana treatment center.").

But that leaves unprohibited the possession in a vehicle of cannabis of any permissible THC level—either medical marijuana, including low-THC cannabis, or hemp—in any permissible non-smoking form as well as the use of hemp and non-smokable low-THC cannabis in a vehicle. And pertinent to this case, it leaves unprohibited the possession of hemp in a form *for smoking*, as well as *the act of smoking it,*

35

inside a vehicle. *Cf.* § 581.217(2), Fla. Stat. (2023) ("Hemp is an agricultural commodity. . . . Hemp-derived cannabinoids . . . are not controlled substances or adulterants if they are in compliance with this section. . . ."); § 581.217(3)(e) (" 'Hemp' means the plant *Cannabis sativa* L. and any part of that plant, including the seeds thereof, and all derivatives, extracts, cannabinoids, isomers, acids, salts, and salts of isomers thereof, whether growing or not, that has a total delta-9-tetrahydrocannabinol concentration that does not exceed 0.3 percent on a dry-weight basis, with the exception of hemp extract, which may not exceed 0.3 percent total delta-9-tetrahydrocannabinol on a wet-weight basis."); *see also Baxter*, 389 So. 3d at 810 n.4 ("Smokable hemp was authorized in Florida beginning July 1, 2020. . . . Unlike medical marijuana, there are no restrictions placed on smoking hemp in vehicles." (citation omitted) (first citing § 581.217, Fla. Stat. (2020); and then citing § 581.217, Fla. Stat. (2021))).

Whether that is wise public policy is wholly beside the point. The legislature has declined to prohibit the smoking of a form of cannabis in a vehicle, and it is not for the judiciary to second guess that decision but rather to faithfully interpret the United States Constitution's Fourth Amendment and Article I, Section 12, of the Florida Constitution and to conform its application of those constitutional provisions to the statutes as they have been enacted and the facts as they have been presented. What the Legislature has done with regard to other forms of cannabis, as well as other potentially intoxicating substances, the Legislature could do for hemp. *Cf.* § 316.1936(2)(a), Fla. Stat. (2023) ("It is unlawful and punishable as provided in this section for any person to possess an open container of an alcoholic beverage or consume an alcoholic beverage while operating a vehicle in the state or while a passenger in or on a

36

vehicle being operated in the state."). Judge Villanti's "apprehensions," as realistic as they may be, "are better directed to that branch of government with authority to amend the [statutes]." *See Republic of Argentina v. NML Cap., Ltd.*, 573 U.S. 134, 146–47 (2014) ("[T]he question . . . is not what Congress would have wanted but what Congress enacted . . . ." (quotation marks omitted) (quoting *Republic of Argentina v. Weltover, Inc.*, 504 U.S. 607, 618 (1992))).

What is pertinent to the resolution of this case on its facts is that an officer who smells either raw cannabis or the smoke from burnt or burning cannabis has encountered an odor that is no more likely to be indicative of criminal activity than licit use of a legal substance. On this record and under the statutes as they currently read, that smell, in isolation, does not give rise to probable cause to justify a search.

Of course, as emphasized in the majority opinion, this is not to suggest that the odor of cannabis no longer has any role in the establishment of probable cause. In any given situation, there may be additional facts that warrant attaching a higher degree of criminal suspicion to the odor of cannabis. *See Gates*, 462 U.S. at 238 (explaining that probable cause is a "practical, common-sense decision" based on "all the circumstances"); *Baxter*, 389 So. 3d at 817 (MacIver, J., concurring in result) (reasoning that the defendant's "inconsistent, possibly evasive answers" and "[m]oving a bag from the front seat to the back seat," "combined with the smell of marijuana," could "lead to the inference that [he] was trying to hide contraband"). And it is conceivable that there may come a point in future cases when the State can establish probable cause for a search or seizure by pointing to objective criteria that demonstrates a substantial chance that the odor of cannabis is

37

indicative of criminal activity.  But the State did not make such a showing in this case.

## IV.

The Fourth Amendment "safeguard[s] the privacy and security of individuals against arbitrary invasions by governmental officials." *Camara v. Mun. Ct. of City & Cnty. of San Francisco*, 387 U.S. 523, 528 (1967).  While the expectation of privacy in an automobile is diminished, such an expectation exists nonetheless.  *See South Dakota v. Opperman*, 428 U.S. 364, 367–68 (1976) (recognizing that automobiles are "effects" within the meaning of the Fourth Amendment but bear a "diminished" expectation of privacy).  Law enforcement need not obtain a search warrant to search an automobile, but probable cause is required.  Conceivably, every automobile has the *possibility* of harboring criminal conduct or contraband.  Like houses and pants with pockets, automobiles are typically opaque and include compartments in which objects may be hidden.  Allowing searches based on nothing more than what law enforcement could speculate is possible is to sanction arbitrary governmental invasions.  If the State can point to nothing about the particular circumstances of merely potentially illegal activity that indicate a substantial chance that the actor is flouting the law rather than engaging in the wholly legal conduct that is likewise indicated by available evidence, then allowing such a search based on the mere potential of illegality exposes law abiders and law violators alike to "unfettered governmental intrusion."  *Delaware v. Prouse*, 440 U.S. 648, 663 (1979); *cf. Teamer*, 151 So. 3d at 429 ("[A]nyone who chooses to paint his or her vehicle a different color could be pulled over by law enforcement every time he or she drives it.").  More is required.  A mere possibility is not a fair probability, and a substantial chance cannot be

reasonably inferred from a random toss-up. The Fourth Amendment and Article I, Section 12 require a "practical, common-sense decision" about what will probably be found in the place to be searched, not mere surmise. *See Gates*, 462 U.S. at 238.

LaROSE, Judge, Concurring.

I whole heartedly join the majority opinion. The passage of time and the changing legal landscape of cannabis regulation make *Owens* a dead letter. We rightfully discard the "plain smell" doctrine.

Judge Moe's partial dissent, however, baffles me. Seemingly, she challenges the constitutionality of en banc proceedings in Florida's appellate courts.[5] She invites the supreme court to revisit Florida Rule of Appellate Procedure 9.331. Judge Moe, of course, is not a lone voice questioning the constitutionality of rule 9.331. *See BAM Trading Servs., Inc. v. Off. of Fin. Regul.*, 395 So. 3d 687, 694-98 (Fla. 1st DCA 2024) (Tanenbaum, J., concurring). This minority view claims that en banc proceedings conflict with article V, section 4(a) of our constitution. That provision requires a three-judge panel to consider and decide each appeal.

Respectfully, I disagree with the partial dissent. I discern an unwarranted attack on a procedural rule that ensures, as needed, consistency, predictability, and stability in intradistrict decisions. *See generally In re Rule 9.331, Determination by a Dist. Ct. of Appeal En Banc (En Banc I)*, 374 So. 2d 992, 993 (Fla. 1979) ("The purpose of the

---

[5] No party challenges our en banc consideration of this case.

proposed recommendation is to provide a formal procedural mechanism to permit the district courts to settle conflicts of decisions arising within the same district and to speak with one voice as a court on matters of exceptional importance.").[6]

En banc proceedings have a long pedigree. The term *en banc* is a French phrase. *See generally* Matt Liles & Anthony B. Sanders, *En Banc or in Bank? Take A Seat ...*, 107 Judicature 34, 34 (2023) (" 'En banc,' in modern French, literally means 'on bench' or 'in bench.' "). With the Norman invasion of England in 1066, "Old French made its way into English law court." *Id.* at 35. And, of course, "[t]he modern English meaning of the phrase—that is, a full court hearing a case, especially on appeal—was imported into American legal terminology before the founding, as with most other English legal heritage." *Id.* at 37. "Early on, it seems 'in bank' (another variety) was most popular in the United States, with the earliest example in an opinion by the Common Pleas of Philadelphia County from 1785." *Id.*

In 1941, the United States Supreme Court held that the federal courts of appeal could address cases en banc, not just in three-judge panels. *See Textile Mills Sec. Corp. v. Comm'r*, 314 U.S. 326, 332 (1941) (explaining that the statute providing that the court of appeals should not have less than three judges was not a limitation on the number of

---

[6] Litigants frequently ask us to rehear cases en banc. These entreaties are rarely successful. Between 2021 and 2024, we issued one en banc opinion per year. In 2019 and 2020, we issued three en banc opinions per year. Obviously, en banc opinions are hardly the "bread and butter" of our work. *See also* William D. Slicker, *En Banc Hearings, by the Numbers*, 95 Fla. B.J., Mar./Apr. 2021, at 39, 39 (discussing the number of en banc opinions the district courts have issued since 1982).

judges on the court who could hear the case and that all five active judges could sit en banc).[7]

Floridians have known the salutary benefits of en banc proceedings since the legislature created the district courts of appeal. Indeed, in the 1950s, docket congestion in the supreme court, "the court of last resort[,] had become almost intolerable. The time had come when the court, working at top speed, with cases, except extremely emergent ones, set in the order of their maturity, was hearing arguments as late as fourteen months after the cases were ready for oral presentation." *Lake v. Lake*, 103 So. 2d 639, 640 (Fla. 1958).

The legislature created the district courts of appeal, initially with three judges sitting on each court, to address supreme court docket congestion and restore due justice to the people. *See* Kimberly Kanoff Berman, Adam Richardson, & Robert Scavone, Jr., *A Not-So-Little Problem with Precedent: Intradistrict Conflict in Florida District Courts of Appeal*, Fla. B.J., January/February 2023, at 14; Florida Second District Court of Appeal, *History of the Second District Court of Appeal: Workload* (last visited Aug. 7, 2025), at https://2dca.flcourts.gov/About-the-Court/History-of-the-Court#:~:text=Workload,2023%20realignment%20of%20the%20districts.

For most cases, Floridians intended the district courts of appeal "to be courts of final, appellate jurisdiction." *Lake*, 103 So. 2d at 642 (first citing *Diamond Berk Ins. Agency v. Goldstein*, 100 So. 2d 420, 421 (Fla. 1958), and then citing *Ansin v. Thurston*, 101 So. 2d 808, 811 (Fla. 1958)); Daniel H. James, *Certiorari Power of the Florida Supreme Court to*

---

[7] The Court did not define "en banc,"—"a move that confirms it was already an established part of American legal lingo." Liles, *supra* at 38 (discussing *Textile Mills*).

*Review Decisions of the District Courts of Appeal*, 15 U. Mia. L. Rev. 258, 263 (1961), https://repository.law.miami.edu/umlr/vol15/iss3/4 (footnotes omitted). "If they are not considered and maintained as such the system will fail. Sustaining the dignity of decisions of the district courts of appeal must depend largely on the determination of the Supreme Court not to venture beyond the limitations of its own powers . . . ." *Lake*, 103 So. 2d at 642. Undisputedly, the limited jurisdiction of the supreme court reflected the importance of the district courts of appeal. *See* art. V, § 3(b).

As history demonstrates, when intradistrict conflicts arose, later panels would overrule prior case dispositions. *See* Berman, *supra* 41, at 14. As the legislature added additional appellate judges, the district courts of appeal continued to resolve intradistrict conflicts through informal en banc proceedings. *See id.*; Anne Cawthon Booth & Julian Clarkson, *The Florida En Banc Rule*, 36 Fla. L. Rev. 71, 73 (1984), https://scholarship.law.ufl.edu/flr/vol36/iss1/3

> A judge, or a panel of judges, who believed that an opinion in a pending case overlooked or misconstrued another decision could informally discuss their concerns with the author of the opinion and the panel on the case. At the request of either panel or nonpanel judges, a conference of the entire court could be called to discuss the possible conflict.

*Id.*

By the late 1960s, the supreme court recognized that the district courts of appeal could resolve intradistrict conflicts. *See generally Little v. State*, 206 So. 2d 9, 10 (Fla. 1968) (explaining that an alleged intradistrict conflict should be resolved by the district court because article V, section 4 of the Florida Constitution created jurisdiction in the supreme court "on the so-called conflict theory, [only] when a district court decision is in direct conflict with a decision of [a]nother district

court of appeal or of the Supreme Court on the same point of law"). Back then, the supreme court lacked constitutional authority to resolve intradistrict conflicts. *See id.*

In 1972, a constitutional amendment to article V "authoriz[ed] the Supreme Court discretionary jurisdiction to resolve conflicts between decisions of *any* district courts of appeal." *Schreiber v. Chase Fed. Sav. & Loan Ass'n*, 422 So. 2d 911, 914 (Fla. 3d DCA 1982) (Nesbitt, J., dissenting) (citing art. V, § 3(b)(3), Fla. Const. (1972)). *Compare* art. V, §4(2) (as amended in the general election of Nov. 6, 1956, which at the same time created the DCAs) ("The supreme court may review by certiorari any decision of a district court of appeal . . . that is in direct conflict with a decision of *another* district court of appeal or of the supreme court on the same point of law . . . ." (emphasis added)), *with* art. V, §3(b)(3) (as amended in the special election of Mar. 14, 1972) (stating that the supreme court "[m]ay review by certiorari any decision of a district court of appeal . . . that is in direct conflict with a decision of *any* district court of appeal or of the supreme court on the same question of law" (emphasis added)). "Meanwhile, in the district courts, later panels were still overruling earlier panels, with no authority telling them they [should not]." Berman, *supra* 41, at 14. I am aware of no effort to halt this practice or otherwise corral the district courts of appeal's jurisdiction over intradistrict conflicts.

Effective January 1, 1980, the supreme court adopted rule 9.331, anticipating major changes to the court's jurisdiction. *See En Banc I*, 374 So. 2d at 992 ("The Florida Appellate Structure Commission recommended that this Court adopt a new appellate rule authorizing the district courts of appeal to sit en banc to resolve intradistrict conflicts of decisions or to consider cases of exceptional importance and included a

43

proposed rule for adoption in its report.").  Note that at that time the supreme court had jurisdiction to hear conflict cases from a district court of appeal.  *See* Booth, *supra* 42, at 71 ("[Rule 9.331] imposes on each district court a function which was within the conflict jurisdiction of the Florida Supreme Court prior to an amendment to the state constitution in 1980.").

When adopting rule 9.331, the supreme court noted that the Florida Appellate Structure Commission "carefully studied a possible constitutional infirmity in the en banc rule":

> Article V, section 4(a), Florida Constitution, provided: "Three judges shall be necessary to a decision."  This provision might be construed to mean that district courts cannot constitutionally sit in panels larger than three judges.  The Commission's studied opinion, however, is that such a rigid construction of article V, section 4(a), *is neither required, nor is it the most reasonable.*  A memorandum of law prepared in 1961 by Charles A. Carroll, former judge of the Third District Court of Appeal, addressed this very issue.[8]  Judge Carroll concluded that this constitutional provision sets only a minimum standard and does not prohibit en banc review by district courts of appeal.  Notably, a similar construction of a federal statute was necessary to permit federal circuit courts to hear cases en banc.

*En Banc I*, 374 So. 2d at 993 (emphasis added); *see also Chase Fed. Sav. & Loan Ass'n v. Schreiber*, 479 So. 2d 90, 93 (Fla. 1985) ("In holding the en banc process constitutional, we construed the 'three judges shall

------

8 Judge Carroll's memorandum is attached as Appendix B to the Commission's Report and Recommendation of the supreme court's website.  William H. Adams III, The Comm'n on the Fla. App. Ct. Structure, *Report of the Supreme Court Commission on the Florida Appellate Structure*, 53 Fla. B.J. 274 app. B (1979), https://supremecourt.flcourts.gov/content/download/242857/file/1979%20Commission%20on%20the%20Florida%20Appellate%20Court%20StructureOCR.pdf.

consider each case' language of article V, section 4, as not restricting the district courts from hearing cases en banc. Our decision was consistent with the decision of the United States Supreme Court in *Textile Mills Securities Corp. v. Commissioner*, 314 U.S. 326 (1941)."); *In re Rule 9.331, Determination of Causes by a Dist. Ct. of Appeal En Banc, Fla. Rules of App. Proc. (En Banc II)*, 416 So. 2d 1127, 1128 (Fla. 1982) ("This Court agreed with the commission and concluded that an en banc rule as part of Florida's appellate structural scheme was appropriate and constitutional, particularly under the philosophy that the district courts should, to the extent possible, be final appellate courts." (citing *En Banc I*, 374 So. 2d at 992-93)); William H. Adams III, The Comm'n on the Fla. App. Ct. Structure, *Report of the Supreme Court Commission on the Florida Appellate Structure*, 53 Fla. B.J. 274, 279 (1979), https://supremecourt.flcourts.gov/content/download/242857/file/1979%20Commission%20on%20the%20Florida%20Appellate%20Court%20StructureOCR.pdf.

The partial dissent acknowledges that the supreme court declared rule 9.331 constitutional. As it observes, "[t]he Florida Supreme Court has said that rule 9.331 is constitutional." "[I]f the supreme court says the rule is constitutional, then it is."

I must note that the partial dissent incorrectly concludes that en banc proceedings involve a question of our jurisdiction. Our constitution grants the district courts of appeal jurisdiction to resolve limited types of cases. *See* art. V, § 4(b). In contrast, the three-judge panel rule has nothing to do with our jurisdiction. *See* art. V, § 4(a). It is, as I see it, a claims processing device that instructs us how, in the first instance, to dispose of our cases. *Cf. Schreiber*, 422 So. 2d at 914 ("It is clear that [rule] 9.331, authorizing en banc proceedings, is procedural in nature

45

rather than a grant of substantive authority." (citing *State Farm Mut. Auto. Co. v. Judges*, 405 So. 2d 980 (Fla. 1981))). Unfortunately, the partial dissent conflates the jurisdictional grant in article V, section 4(b), with the claims processing device described in article V, section 4(a).

The partial dissent also observes that "the ratifiers of article V, section 4 would not have understood article V, section 4 to grant district courts of appeal jurisdiction to resolve their own intradistrict conflicts by going en banc." History, of course, proves otherwise.

The 1980 amendments to article V cabined the supreme court's jurisdiction, removing, among other things, the court's authority to resolve intradistrict conflicts. "The 1980 amendment *restored* the constitutional provision to its stature before 1972 . . . ." *Schreiber*, 422 So. 2d at 914 (emphasis added). Although the 1980 amendments altered the supreme court's jurisdiction, "the ratifiers were not asked to change anything about the district courts of appeal," as the partial dissent recognizes. History teaches us that the district courts of appeal resolved intradistrict conflicts and conducted informal en banc proceedings. *See id.* This practice was well known. *See En Banc I*, 374 So. 2d at 993. Consequently, "[t]he constitutional amendment was . . . presented to the legislature and, in turn, to the electorate . . . with the understanding that the district courts of appeal could sit en banc to resolve intra-district conflict." *En Banc II*, 416 So. 2d at 1128.

The legislature made no effort to end en banc proceedings with the 1980 revisions to article V. Presumably, the legislature knew that the supreme court designed rule 9.331 "to provide a formal procedural mechanism for resolving conflicts; to allow the court to speak 'with one voice' on matters of exceptional importance; to reduce the supreme court's workload; and to make district courts the courts of last resort in

46

most instances." Booth, *supra*, at 73-74 (footnotes omitted); *see also En Banc I,* 374 So. 2d at 993. The goals of the en banc rule aligned with the legislature's vision when it established the district courts of appeal in the 1950s. *See Lake,* 103 So. 2d at 641-42; *see also En Banc II*, 416 So. 2d at 1128 ("This Court agreed with the commission and concluded that an en banc rule as part of Florida's appellate structural scheme was appropriate and constitutional, particularly under the philosophy that the district courts should, to the extent possible, be final appellate courts.").

Other than suggesting that the supreme court revisit the need for and scope of rule 9.331, the partial dissent offers no alternative to avert the chaos that would flow from an absence of a mechanism to resolve intradistrict conflicts. That three-judge panels of the same court can reach differing dispositions on cases with the same legal issue without a way to resolve conflict is shocking. The legitimacy of the rule of law would be compromised; certainly it would be fleeting. The en banc process, informal in its roots and formalized under rule 9.331, "is designed to help the district courts avoid conflict, assure harmonious decisions within the courts' geographic boundaries, and develop predictability of the law within their jurisdiction." *Chase Fed. Sav.*, 479 So. 2d at 93.

> The en banc process provides a means for Florida's district courts to avoid the perception that each court consists of independent panels speaking with multiple voices with no apparent responsibility to the court as a whole. The process provides an important forum for each court to work as a unified collegial body to achieve the objectives of both finality and uniformity of the law within each court's jurisdiction.

*Id.* at 93-94.

47

As the supreme court has explained, our appellate structure envisions "a strong district court of appeal which possesses the responsibility to set the law within its district." *En Banc II*, 416 So. 2d at 1128. With that purpose in mind and recognizing that humility may be more virtuous than hubris, "each three-judge panel of a district court of appeal should not consider itself an independent court unto itself, with no responsibility to the district court as a whole." *Id.* Utilizing en banc proceedings ensures that each district court of appeal adheres to and maintains "the type of appellate structural scheme adopted by the electorate." *See id.*

I see little reason for the supreme court to revisit rule 9.331 through rule proceedings. If, as the partial dissent observes, the en banc rule is constitutionally infirm, resolution of that concern should come before the supreme court in an actual case or controversy where the issue can be extensively fleshed out through fact finding, briefing, and argument.

NORTHCUTT, SILBERMAN, KELLY, and KHOUZAM, JJ., Concur.

VILLANTI, Judge, Dissenting.

Because I do not agree with the majority's assertion that recent legislative changes legalizing cannabis for medical purposes compels us to recede from our long-standing "plain smell" warrantless exception to Fourth Amendment searches, I respectfully dissent from the majority. However, because Mr. Williams was appropriately adjudicated upon

violation of the conditions of his probation, I affirm the revocation of probation and conviction.

As the majority adeptly chronologizes, our legislature within the last decade has legalized cannabis in specific forms and concentrations and for specific purposes. Regardless of those changes, possessing or using cannabis for any reason other than "medical use," as it is defined in section 381.986, Florida Statutes, remains a crime in the state of Florida. *See Wright-Johnson v. State*, 405 So. 3d 501, 506 (Fla. 3d DCA 2025); *Baxter v. State*, 389 So. 3d 803, 819 (Fla. 5th DCA 2024) (MacIver, J., concurring in result only) ("[P]ossession of marijuana, except in very limited circumstances, is still a crime pursuant to [Florida law].").  "The changes to federal and state law that [the majority recommends] should eliminate the 'plain smell' doctrine have not eliminated either the criminal prohibition of marijuana possession or the expectation that law enforcement will indeed investigate and enforce the law."  *Baxter*, 389 So. 3d at 819 (MacIver, J., concurring in result only).

The legalization of possession of hemp and medical marijuana in specific concentrations did not wholesale decriminalize the possession of marijuana.  Thus, as Judge MacIver posited in *Baxter*, I too reject the position "that the smell of marijuana *might* be indicative of lawful use" so therefore the plain smell of marijuana is "insufficient to justify a brief detention to inquire about the ambiguity" of whether the smell is from a legal versus an illegal source.  *See id* (emphasis added).  "A determination that reasonable suspicion exists . . . need not rule out the possibility of innocent conduct."  *United States v. Arvizu*, 534 U.S. 266, 277 (2002) (citing *Illinois v. Wardlow*, 528 U.S. 119, 125 (2000)).  The resolution of that ambiguity is for the officer to determine upon further investigation,

49

and it is one factor in the "totality of the circumstances" analysis utilized in Fourth Amendment cases.

In *State v. Teamer*, 151 So. 3d 421, 427-28 (Fla. 2014), the Florida Supreme Court majority held that an officer who initiated a *Terry*[9] traffic stop based solely on the inconsistency between the color of a car versus what color came up in motor vehicle registration records was not "reasonable" in a totality of the circumstances analysis, and therefore evidence of the seizure of marijuana from the driver should have been suppressed. In dissenting, Justice Canady wrote about "the nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interests alleged to justify the intrusion." *Id.* at 432 (Canady, J., dissenting) (quoting *United States v. Place*, 462 U.S. 696, 703 (1983)). As Justice Canady explained:

> The Supreme Court's categorical authorization of brief investigative detentions based on a reasonable suspicion of criminal activity flows from the conclusion that "[w]hen the nature and extent of the detention are minimally intrusive of the individual's Fourth Amendment interests, the opposing law enforcement interests can support a seizure based on less than probable cause."

*Id.*

An officer conducting a legally valid traffic stop who then investigates whether the smell emanating from a vehicle is legal hemp or marijuana or illegal cannabis is minimally intruding on the Fourth Amendment rights of the one who claims to be in legal possession of the substance. After all, if the individual claiming to legally possess the marijuana is not engaging in criminal activity, there should be no problem with the officer's investigation.

---

[9] *Terry v. Ohio*, 392 U.S. 1 (1981).

50

Furthermore, while citizens have a reasonable expectation of privacy in their vehicles, that expectation must be balanced with the State's compelling interest in ensuring the safety of drivers on Florida's roadways. "Where a right to privacy attaches, the state may vindicate an encroachment on that right if it demonstrates that the intrusion is justified by a compelling state interest and that the state has used the least intrusive means to accomplish its goal." *State v. Rutherford*, 707 So. 2d 1129, 1131 (Fla. 4th DCA 1997), *disapproved of on other grounds by State v. Johnson,* 814 So. 2d 390 (Fla. 2002). The state's authority and responsibility to minimize impaired drivers on our roadways is a compelling interest that justifies any minor intrusion on an individual to show that the substance in his or her possession is in fact legal.

Even those who legally possesses marijuana or cannabis may not actually consume it while driving a car with very specific exception. Section 381.986 expressly provides that "medical use" does not include the use or administration of cannabis while in a vehicle, aircraft, or motorboat, except in *smokeless low-THC form.* § 381.986(k)5.f, Fla. Stat. (2024) (emphasis added). This makes sense because cannabis unarguably impairs one's motor skills, cognition, and driving ability. Nathalie A. Desrosiers et al., *Smoked Cannabis' Psychomotor and Neurocognitive Effects in Occasional and Frequent Smokers*, 39(4) J. Analytical Toxicology 251 (2015); *see also* Hartman RL & Huestis MA, *Cannabis effects on driving skills*, 59(3) Clinical Chemistry 478 (2013). Presently, although the majority of states have legalized marijuana in varying forms and amounts for medical use, it remains illegal in every state and the District of Columbia to *drive* while impaired. *See* Nat'l Highway Traffic Safety Admin., *Drug-Impaired Driving*,

51

https://www.nhtsa.gov/risky-driving/drug-impaired-driving (last visited May 16, 2025).

The consequences of impaired driving can be devastating, as we all know. *See Birchfield v. North Dakota,* 579 U.S. 438, 443 (2016) ("Drunk drivers take a grisly toll on the Nation's roads, claiming thousands of lives, injuring many more victims, and inflicting billions of dollars in property damage every year."); *see also* § 316.93(1)(a), Florida Statutes (2024) ("A person is guilty of the offense of driving under the . . . the person is driving or in actual physical control of a vehicle within this state and the person is under the influence of . . . any substance controlled under chapter 893 . . . ."). Legalizing a substance that is known to cause impairment and that carries the significant risk for abuse inherently requires meaningful efforts to protect the public's safety. *See Birchfield,* 579 U.S. at 464 ("The States and the Federal Government have a 'paramount interest . . . in preserving the safety of . . . public highways.' " (quoting *Mackey v. Montrym,* 443 U.S. 1, 17 (1979))); *see also Fla. House of Representatives v. Florigrown, LLC*, 278 So. 3d 935, 939 (Fla. 1st DCA 2019) ("The legislature has the authority and responsibility to protect the public from harm by regulating the availability of a controlled substance that the federal government has determined is not safe for medical use, is susceptible to abuse, and presents a harm to the public.").

Thus, while our legislature legalized marijuana use by certain individuals for specific medical purposes, it also recognized that legalization increases the risk that people will drive while impaired and therefore mandated a public safety campaign to educate the public about the dangers of driving under the influence of cannabis. *See* § 381.989(3)(a) ("The Department of Highway Safety and Motor Vehicles

52

shall implement a statewide impaired driving education campaign to raise awareness and prevent marijuana-related and cannabis-related impaired driving.").

Contrary to what some may believe, "the privilege of driving an automobile over public highways does not amount to an absolute organic right." *State v. Jones*, 483 So. 2d 433, 439 (Fla. 1986). "[A]s with many other activities, the government has the power to regulate the privilege to drive subject to the condition that the licensee will perform the activity safely and competently." *State, Dep't of Highway Safety & Motor Vehicles v. Degrossi,* 680 So. 2d 1093, 1094 (Fla. 3d DCA 1996). "Our government provides the roadways of Florida as a benefit to the public at large." *Jones*, 483 So. 2d at 439. "Accordingly, this state retains extensive authority to safeguard the driving public via its police power." *Id.*

The majority endorses the conclusion that the smell of cannabis alone no longer provides law enforcement probable cause to search a driver's vehicle because the smell of illegal cannabis is virtually indistinguishable from legal hemp or medical marijuana. Without a doubt, this is an unintended consequence of the legislature's legalization of marijuana in limited cases and hemp in all forms. Why would anyone intentionally enact a law that streamlines criminal behavior? The answer is clearly they would not.

However, I see no reason to abandon forty-plus years of Fourth Amendment jurisprudence because our legislature decided to legalize cannabis for limited medical use. This decision was based upon compassion for individuals suffering from severe, often terminal illnesses, not because the plain smell doctrine was problematic. *See Fla. Dep't of Health v. Florigrown, LLC*, 317 So. 3d 1101, 1106-07 (Fla. 2021).

53

Receding from the plain smell doctrine will perpetuate the unintended consequences the legalization of cannabis created and upend years of otherwise valid and authoritative caselaw. "*Stare decisis* is the Latin phrase for a foundation stone of the rule of law: that things decided should stay decided unless there is a very good reason for change." *Dobbs v. Jackson Women's Health Org.*, 597 U.S. 215, 363 (2022). The plain smell doctrine has become ingrained in our culture and in our constitutional law. Everyone—criminals, law enforcement, the judiciary and attorneys, and the general public—is aware of it. Police officers have been educated about the plain smell doctrine and have developed years of experience utilizing it in the field. Adhering to our precedent "is the preferred course because it promotes the evenhanded, predictable, and consistent development of legal principles, fosters reliance on judicial decisions, and contributes to the actual and perceived integrity of the judicial process." *Michigan v. Bay Mills Indian Cmty.*, 572 U.S. 782, 798 (2014) (quoting *Payne v. Tennessee*, 501 U.S. 808, 827 (1991)).

Receding from the doctrine will make it easier for those illegally possessing, using, and/or trafficking in marijuana—as well as other illicit drugs, substances, and items—to continue to do so, and it will expose the public to greater risk to their personal safety. The rights of one accused of illegally possessing or using cannabis while operating a vehicle should not trump "the rights of the public to operate over the public highways in safety and free from . . . death, injury and destruction." *Jones v. Kirkman*, 138 So. 2d 513, 515 (Fla. 1962).

People who traverse our Florida highways are entitled to share the roads with sober and safe drivers. The majority interpretation of the law and wholesale erosion of well-developed, reasonable Fourth Amendment analysis will only undermine the evolved public expectation that law

enforcement will continue to protect them as they motor along Florida's highways.

The Supreme Court of Florida did not address the certified question presented in *Baxter*.  I am hopeful that the Court will address the certified question posed by the majority here.  This is an important issue that has caused conflict among our sister courts, and it must be resolved.

I am equally hopeful that the Florida Legislature is aware of the dilemma that was inadvertently caused by the widespread acceptance of hemp and legalization of medical marijuana.  I invite the legislature to review this issue and to consider that its recent legislation legalizing cannabis for medical purposes has made it easier for nefarious individuals to engage in criminal activity.  Because I believe this is a great injustice to the citizens of Florida, I dissent from the majority's conclusion that we have no choice but to recede from the "plain smell" doctrine.  I join the majority only in affirming the revocation of Mr. Williams' probation.

MOE, J., Concurs.

MOE, Judge, Concurring in part and Dissenting in part.

According to the United States Supreme Court's interpretation of the Fourth Amendment to the United States Constitution—an interpretation we are bound to follow pursuant to article I, section 12 of the Florida Constitution—the search and seizure here was reasonable. The trial judge was right to deny the motion to suppress.

55

While I concur with the majority that the order on review should be affirmed, for the reasons stated here I dissent from that portion of the majority's decision that recedes from *Owens*. I also dissent from the granting of en banc review. Respectfully, it would be appropriate for the Florida Supreme Court to reconsider the constitutionality of Florida Rule of Appellate Procedure 9.331 in light of the original public meaning of article V, section 4 of the Florida Constitution.

## I. Search & Seizure

### A. Reasonable Suspicion

For a law enforcement officer's investigatory stop to be lawful, the officer must have a reasonable, articulable suspicion of criminal activity. *Musallam v. State*, 133 So. 3d 568, 569 (Fla. 2d DCA 2014). A reasonable suspicion "has some factual foundation in the circumstances observed by the officer, when those circumstances are interpreted in the light of the officer's knowledge." *State v. Zachery*, 255 So. 3d 957, 960 (Fla. 2d DCA 2018) (quoting *Bailey v. State*, 717 So. 2d 1096, 1097 (Fla. 5th DCA 1998)); *see also Terry v. Ohio*, 392 U.S. 1, 21–22 (1968) (considering the "facts available to the officer"); *Navarette v. California*, 572 U.S. 393, 397 (2014) (explaining that reasonable suspicion is "dependent upon both the content of information possessed by police and its degree of reliability.").

The reasonableness of the officer's suspicion turns on the totality of the circumstances and necessarily accounts for both the facts and circumstances that led to the officer's suspicion, as well as the reasonable inferences drawn from those facts. *Mackey v. State*, 124 So. 3d 176, 183 (Fla. 2013). Behavior that could have an innocent explanation can still provide the basis for reasonable suspicion because a reasonable degree of suspicion rationally attaches to certain types of

56

noncriminal acts. *United States v. Sokolow*, 490 U.S. 1, 10 (1989). Ultimately, that the suspect might have an innocent explanation does not render an officer's suspicion unreasonable if the suspicion arose from circumstances that a reasonable law enforcement officer would find suspicious. *State v. J.C.,* 292 So. 3d 30, 35 (Fla. 2d DCA 2020).

Reasonable suspicion is a less demanding standard than probable cause. *Alabama v. White* 496 U.S. 325, 330 (1990). It "can be established with information that is different in quantity or content than that required to establish probable cause," and it can arise from information that is less reliable than what is required to show probable cause. *Id.* Consequently, "police can stop and briefly detain a person for investigative purposes if the officer has a reasonable suspicion supported by articulable facts that criminal activity 'may be afoot,' even if the officer lacks probable cause." *State v. Teamer*, 151 So. 3d 421, 425 (Fla. 2014) (quoting *United States v. Sokolow*, 490 U.S. 1, 7 (1989)).

### B. Probable Cause

While a reasonable suspicion is all that is necessary for an investigatory stop, for a law enforcement officer to take the next step and search a vehicle (and the containers within the vehicle), the law enforcement officer must have something more. For a search to be legally justified under the Fourth Amendment and article I, section 12, the officer must have probable cause to believe that "there is a fair probability that contraband or evidence of a crime will be found" in the car. *See Illinois v.* Gates, 462 U.S. 213, 238 (1983); *see also California v. Acevedo,* 500 U.S. 565, 580 (1991) ("The police may search an automobile and the containers within it where they have probable cause to believe contraband or evidence is contained."). Probable cause is viewed from the perspective of a police officer with specialized training.

*Gates*, 462 U.S. at 238. It accounts for the factual and practical considerations of everyday life on which reasonable and prudent persons—not legal technicians—act. *Id.; see also State v. Diaz-Ortiz*, 174 So. 3d 1022, 1024 (Fla. 5th DCA 2015).

### C. *Kilburn & Baxter*

In *Kilburn*, the First District said that "[a] potentially lawful activity cannot be the sole basis for a detention" because, if this were allowed, then "the Fourth Amendment would be eviscerated." *Kilburn v. State*, 297 So. 3d 671, 675 (Fla. 1st DCA 2020). In *Baxter*, the Fifth District cited *Kilburn* for the premise that the smell of cannabis alone cannot form the basis of reasonable suspicion or probable cause because the odor of cannabis could emit from lawful activity. *Baxter v. State*, 389 So. 3d 803, 809 (Fla. 5th DCA 2025).

I readily acknowledge that *Kilburn* sounds like it supports *Baxter*'s reasoning, if we read those words in isolation and divorce them from their context. But we all know the problem with reading things in isolation and divorcing things from context. When quoting words from an opinion, we typically account for whether those words are holding or dicta. And to determine what is holding and what is dicta we consider the facts and circumstances before the court and the decisional path of reasoning. *Pedroza v. State*, 291 So. 3d 541, 547 (Fla. 2020) ("A holding consists of those propositions along the chosen decisional path or paths of reasoning that (1) are actually decided, (2) are based upon the facts of the case, and (3) lead to the judgment." (quoting Michael Abramowicz & Maxwell Stearns, *Defining Dicta*, 57 Stan. L. Rev. 953, 1065 (2005))).

If we apply *Pedroza*'s holding/dicta distinction, it seems obvious that *Baxter* relies on dicta from *Kilburn*. Consider *Kilburn*'s facts. Mr. Kilburn was stopped because of an irregularity with his license plate

cover and then ultimately charged with carrying a concealed weapon because the officer saw the butt of a handgun sticking out of Mr. Kilburn's waistband. *Kilburn*, 297 So. 3d at 672. Mr. Kilburn was detained, advised of his Miranda rights, and then asked if he had a concealed carry license. *Id.* When Mr. Kilburn acknowledged that he didn't have a concealed carry license, he was arrested. *Id.* At the hearing on his motion to suppress, the deputy testified that he had no basis to detain Mr. Kilburn except that he had the firearm. *Id.* The trial court denied Mr. Kilburn's motion to suppress and the First District reversed, citing to then-recent amendments to Florida's concealed carry law and the fact that firearm ownership is an enumerated right in both the federal and Florida constitutions. *Id.* at 674 ("Bearing arms is not only legal; it also is a specifically enumerated right in both the federal and Florida constitutions."). The right to bear arms is constitutionally protected, so the First District was principally concerned with the idea that a Floridian could be detained simply because he or she exercised a constitutionally protected right. *See id.*

With appreciation for the facts and the decisional path of reasoning in *Kilburn*, it seems evident that when the First District said (with no supporting citation, for what it's worth) that "[a] potentially lawful activity cannot be the sole basis for a detention," those words were meant to be considered in view of the facts and circumstances before the court in *Kilburn*. Considering the point the Florida Supreme Court made in *Pedroza*, *Kilburn*'s holding seems much more limited than *Baxter* suggests.

Even setting aside the holding/dicta distinction, and assuming for the moment that *Kilburn* really does stand for the proposition that reasonable suspicion and probable cause cannot be based on any kind of

activity that could have a potentially lawful explanation, there's still a problem. Florida courts are constitutionally bound to construe article I, section 12 in conformity with the decisions of the United States Supreme Court construing the Fourth Amendment to the United States Constitution. Art. I, § 12, Fla. Const.; *Baxter v. State*, 389 So. 3d 803, 815 (Fla. 5th DCA 2024) (en banc) (MacIver, J., concurring) (raising this concern); *Soca v. State*, 673 So. 2d 24, 27 (Fla. 1996). If *Kilburn* stands for the proposition that *Baxter* proposes it does, then *Kilburn* is at odds with the United States Supreme Court's precedent construing the Fourth Amendment.

## D. Potentially Lawful Conduct Can Give Rise to Reasonable Suspicion.

United States Supreme Court precedent construing the Fourth Amendment is clear: an officer need not rule out the possibility of a lawful explanation for an officer to have reasonable suspicion. *United States v. Arvizu*, 534 U.S. 266, 277 (2002); *see also Sokolow*, 490 U.S. at 7 ("The concept of reasonable suspicion, like probable cause, is not 'readily, or even usefully, reduced to a neat set of legal rules.' " (quoting *Illinois v. Gates*, 462 U.S. 213, 232 (1983))). This is because officers must be empowered to make "commonsense judgments and inferences about human behavior." *Kansas v. Glover*, 589 U.S. 376, 377 (2020) (quoting *Illinois v. Wardlow*, 528 U.S. 119, 125 (2000)).

In *Glover*, a law enforcement officer ran a license plate check on a vehicle and learned Mr. Glover's license had been revoked. *Id.* at 379. On the assumption that Mr. Glover would be the one driving Mr. Glover's vehicle, the officer conducted an investigatory stop, confirmed that Mr. Glover was the driver, and arrested him. *Id.* Mr. Glover then argued the officer lacked reasonable suspicion to initiate the traffic stop because the officer could not have known that Mr. Glover was the driver before

pulling the vehicle over. *Id.* at 378. The Supreme Court held that the officer had a "a particularized and objective basis" to suspect legal wrongdoing based on the information gained from the tag check. *Id.* at 380. While the officer could not have known with certainty that Mr. Glover was driving until he was pulled over, it was reasonable for the officer to suspect that the owner of a car is the one driving the car. *Id.* at 381. The Court reasoned that law enforcement officers, like jurors, must be permitted to rely on probabilities and they must be empowered to make "commonsense judgments and inferences about human behavior." *Id.* at 380–81.

The United States Supreme Court has "consistently recognized that reasonable suspicion 'need not rule out the possibility of innocent conduct.' " *Navarette*, 572 U.S. at 403 (quoting *Arvizu*, 534 U.S. at 277). While the criminal nature of the odor of cannabis must be "immediately apparent," this does not mean that the officer is required to be certain that the odor emanates from contraband. *See Texas v. Brown*, 460 U.S. 730, 741 (1983). Interestingly enough, the United States Supreme Court has itself actually called the phrase "immediately apparent" an "unhappy choice of words" because "it can be taken to imply that an unduly high degree of certainty as to the incriminatory character of evidence is necessary for an application of the 'plain view' doctrine." *Id.* To the contrary, it is sufficient that the items observed by officers "*may* be evidence of a crime, contraband, or otherwise subject to seizure." *Id.* at 737 (emphasis added).

Considering the protections of article I, section 12 in conformity with the Fourth Amendment to the United States Constitution as interpreted by the United States Supreme Court, this isn't even a close

call.  Obviously, the officers had a reasonable suspicion of criminal activity and probable cause to search the vehicle.

It is illegal to smoke cannabis in Florida, subject to certain exceptions.  § 893.13, Fla. Stat. (2023).  Mr. Williams was stopped by detectives at 12:55 a.m.  Even with the windows rolled up, the officers could plainly smell the odor of cannabis emanating from Mr. Williams' vehicle.  The odor only grew more apparent when Mr. Williams rolled down the passenger window.  There is something almost comical about the suggestion that the officers who saw this situation should have assumed Mr. Williams was just sitting in his car with the windows rolled up, treating his glaucoma at 12:55 a.m.  Here, the officers made a "commonsense judgement . . . about human behavior" and evidently inferred that Mr. Williams was hotboxing.  Hotboxing, Urban Dictionary, available at https://www.urbandictionary.com/define.php?term=hotboxing (last visited June 27, 2025) (defining "hotboxing" as "[t]he practice of smoking marijuana in an enclosed space (e.g. a car or a small room) in order to maximize the narcotic effect.").

The smell of cannabis is inherently indicative of potential criminal activity under Florida law.  Objectively, the officers had reasonable suspicion and probable cause under the circumstances.  The purpose of Florida government is to, among other things, "maintain public order." Preamble, Fla. Const.  ("We, the people of the State of Florida, being grateful to Almighty God for our constitutional liberty, in order to secure its benefits, perfect our government, insure domestic tranquility, maintain public order, and guarantee equal civil and political rights to all, do ordain and establish this constitution.").  The commonsense inference the officers made in this case was consistent with the purpose

of Floridian government and it satisfied the low threshold required for reasonable suspicion and probable cause.  Consequently, the detention and search were permissible under the law.

The Florida Constitution gives tremendous power to the Florida Legislature.  Yet nothing the legislature decides to do about cannabis has the power to override article I, section 12 of the Florida Constitution.  And that part of our state's charter commands us to construe article I, section 12 in accordance with the United States Supreme Court's decisions construing the Fourth Amendment to the United States Constitution.  And the United States Supreme Court's precedent construing the Fourth Amendment is decidedly at odds with the majority's decision today.  Because of this, respectfully I must dissent.

## II.  Subject Matter Jurisdiction

### A. Introduction

District courts sitting en banc pursuant to rule 9.331 properly rely on the Florida Supreme Court's determination of the rule's constitutionality in *Chase Fed. Sav. & Loan Ass'n v. Schreiber*, 479 So. 2d 90, 93 (Fla. 1985).  Nothing said here is in any way a criticism of my colleagues, or, for that matter, any other district court of appeal that has invoked rule 9.331.  The Florida Supreme Court has said that rule 9.331 is constitutional.  It has the final say on the Florida Constitution; if the supreme court says the rule is constitutional, then it is.

Yet there are good reasons for the Florida Supreme Court to reconsider.  When dealing with a constitutional question, a court of last resort is "less constrained by the principle of stare decisis than [it is] in other areas of the law."  *See Edelman v. Jordan*, 415 U.S. 651, 671 (1974).  While a high court "may have compulsions to revere past history and accept what was once written . . . it is the Constitution which

63

[members of a high court] swore to support and defend, not the gloss which [their] predecessors may have put on it." Bryan A. Garner, et al., *The Law of Judicial Precedent* 354 (2016) (quoting William O. Douglas, *Stare Decisis* (1949), in *Essays on Jurisprudence from the Columbia Law Review* 18, 19 (1963)). Moreover, "[t]he doctrine of stare decisis bends . . . where there has been an error in legal analysis." *State v. Poole*, 297 So. 3d 487, 506 (Fla. 2020), *as clarified on denial of reh'g* (Apr. 2, 2023) (quoting *Puryear v. State*, 810 So. 2d 901, 905 (Fla. 2002)).

From day one, there have been concerns about the rule's constitutionality. When it adopted rule 9.331, the Florida Supreme Court acknowledged this. *See In re Rule 9.331, Determination of Causes by a Dist. Court of Appeal En Banc, Fla. R. App. P.*, 374 So. 2d 992, 993 (Fla. 1979). However, when it acknowledged those concerns, it did so by reference to the work of another body, the Appellate Structure Commission, and specifically a memo—not included in the opinion—by a former judge of the Third District. *Id.* The rules opinion explained that this former judge concluded that article V, section 4(a) "sets only a minimum standard and does not prohibit en banc review by district courts of appeal." *In re Rule 9.331*, 374 So. 2d at 993. The court itself engaged in no textual analysis of article V, section 4. It articulated no consideration of the original public meaning of that part of the constitution. Meanwhile, it also did not explicitly adopt the constitutional analysis of the former judge of the Third District. It simply said that "[w]e agree that an en banc rule for the district courts would be beneficial to the appellate structure of this state." *In re Rule 9.331*, 374 So. 2d at 993.

Years after amendments to the Florida Supreme Court's jurisdiction in article V of the Florida Constitution had been ratified, the

64

court issued a new rules opinion.  In *In re Rule 9.331, Determination of Causes by a Dist. Court of Appeal En Banc, Fla. R. App. P.*, 416 So. 2d 1127 (Fla. 1982), the court considered an emergency petition by the Florida Conference of District Court of Appeal Judges.  *Id.* at 1127.  The court considered "problems presented in the petition" relating to "the number of judges of a district court of appeal necessary to constitute a 'majority' in terms of an en banc panel."  *Id.*  It "emphasize[d] that a direct and important interrelationship exists between the en banc rule and the new constitutional amendment which limits Supreme Court jurisdiction" and referred to the en banc rule as "an essential part of the philosophy of the constitutional scheme embodied in the new amendment because the Supreme Court no longer has jurisdiction under the amendment to review *intra*-district conflict."  *Id.*  Referencing again the Appellate Structure Commission's report, this time the supreme court said that it "agreed with the commission and concluded that an en banc rule as part of Florida's appellate structural scheme was appropriate and constitutional, particularly under the philosophy that the district courts should, to the extent possible, be final appellate courts."  *Id.* at 1128.  Recognizing that one member of the court had dissented from the original rules opinion on constitutional grounds, the supreme court then said "[t]he constitutional amendment was thereafter presented to the legislature and, in turn, to the electorate of the state with the understanding that the district courts of appeal could sit en banc to resolve intra-district conflict."  *Id.*

There is something that seems anomalous, jurisprudentially, about all of this.  First, in its opinions relating to rule 9.331, the supreme court did not in any way address the original public meaning of article V, section 4.  Article V, section 4 was ratified in the 1950s, decades before

65

the electorate was asked to, in the 1980s, remove the supreme court's discretionary jurisdiction to resolve intra-district conflict. The ratifiers of article V, section 4 did not have a time machine. They could not have understood text ratified in the 1950s to stand for a proposition first advanced in the 1980s. Put differently, the ratifiers of article V, section 4 would not have understood article V, section 4 to grant district courts of appeal jurisdiction to resolve their own intra-district conflicts by going en banc.

Under the fixed-meaning canon of construction, words are to be given the meaning they had when the text was adopted. Antonin Scalia & Bryan Garner, *Reading Law: Interpretation of Legal Texts* 78 (2012) (discussing the fixed-meaning canon). "Although courts routinely apply legal instruments to novel situations over time, their meaning remains fixed." *Id.* Whatever article V, section 4 was understood to mean at the time of ratification in the 1950s, it means the same thing today if that text was never amended.

Just as "new rights cannot be suddenly 'discovered' years later in a document," *id.* at 80, the fixed-meaning canon suggests that article V, section 4's meaning could not evolve with the times. As Thomas M. Cooley recognized, "[a] constitution is not to be made to mean one thing at one time, and another at some subsequent time when the circumstances may have so changed as perhaps to make a different rule in the case seem desirable." Thomas M. Cooley, *A Treatise on the Constitutional Limitations Which Rest upon the Legislative Power of the States of the American Union* 54 (1868). Because the text of the constitution has a fixed meaning, neither the subsequent adoption of a rule of procedure nor a subsequent change to another part of article V would have altered the meaning of article V, section 4.

66

Judge La Rose's concurrence cites an article about intra-district conflict authored by Berman, et al. That article merits careful attention because it supplies further evidence of original public meaning of article V, section 4. In 1957, Floridians ratified an amendment to article V that created the First, Second, and Third districts. Berman, *supra*, at 15. Initially, the legislature funded the constitutionally prescribed minimum number of judgeships. *Id.* In the years following the amendment's ratification, new districts and judgeships were added and yet there was no question that a later panel in a given district could overrule a prior panel. *Id.* Indeed, the supreme court decided a case that approved the practice. *Id.* (citing *Little v. State*, 206 So. 2d 9 (Fla. 1968)). At least according to the authors of this article, *Little* represented "the state of law and practice at that time" and "everyone thought" subsequent panels could overrule the decisions of prior ones. *Id.* Even after the supreme court's jurisdiction was amended in 1972 to grant it supervisory jurisdiction to resolve both intra-district and inter-district conflicts, "in the district courts, later panels were still overruling earlier panels, with no authority telling them they shouldn't." *Id.*

Second, there is something startling about the idea that an amendment to one part of the constitution could be viewed as altering the original public meaning of a different provision ratified decades before. The 1980 amendments to article V related only to the supreme court's jurisdiction; the ratifiers were not asked to change anything about district courts of appeal. *Compare* art. V, § 3, Fla. Const., History ("History**.**—S.J.R. 52-D, 1971; adopted 1972; Am. C.S. for S.J.R.'s 49, 81, 1976; adopted 1976; Am. S.J.R. 20-C, 1979; adopted 1980; Am. H.J.R. 71, 1986; adopted 1986; Am. proposed by Constitution Revision Commission, Revision No. 13, 1998, filed with the Secretary of State May

67

5, 1998; adopted 1998.") *with* art. V, § 4, Fla. Const., History ("History.—S.J.R. 52-D, 1971; adopted 1972."); *see also* Ben F. Overton, *District Courts of Appeal: Courts of Final Jurisdiction With Two New Responsibilities—an Expanded Power to Certify Questions and Authority to Sit En Banc*, 35 Fla. L. Rev. 80, 95–98 (1983) (attaching the full text of the 1980 revisions proposed in Senate Joint Resolution 20-C).

Third, for all the evidence of public discussion surrounding ratification of the 1980 amendments to article V, little evidence (at the risk of overstatement) exists that ratifiers were informed of any effect the amendments would have on the jurisdiction of district courts of appeal. *See, e.g.*, Arthur J. England, Eleanore Mitchel Hunter, & Richard C. Williams, Jr., *Constitutional Jurisdiction of the Supreme Court of Florida: 1980 Reform*, 32 Fla. L. Rev. 147 (1980); Overton, *supra*; *Jenkins v. State*, 385 So. 2d 1356 (Fla. 1980); Anne Cawthorn Booth & Julian Clarkson, *The Florida En Banc Rule*, 36 Fla. L. Rev. 71 (1984). It is clear from that historical evidence that the focus of the ratification campaign was on the supreme court's jurisdiction, not that of the district courts of appeal. Given how much evidence of pre-ratification public discussion was generated by the very members of the Florida Supreme Court who advocated for the 1980 amendments and then, post-ratification, adopted rule 9.331, it's surprising that it isn't easier to find pre-ratification evidence of public discussion about a change in the jurisdiction of district courts of appeal.

Fourth, adoption of the en banc rule seemed to rely heavily on the idea that federal intermediate appellate courts can sit en banc. Yet there are obvious differences between how the Florida Constitution organizes the state judicial branch in article V and how federal courts are organized under Article III of the United States Constitution. Those

differences suggest that we cannot blindly assume that the Florida Constitution leaves room for everything that the United States Constitution allows.

Article III of the United States Constitution left it to Congress's discretion to establish "from time to time" whatever courts it "may" see fit to create. U.S. Const., art. III, § 1. Consistent with Article III, Congress passed Title 28 of the United States Code. Title 28 dictates many of the details surrounding the operation of the United States Courts of Appeal. For example, Title 28 establishes the thirteen United States Circuit Courts, determines their territorial jurisdiction, specifies the number of judges the President shall appoint for each circuit, and sets the salary each circuit judge should receive. 28 U.S.C. §§ 41-45. Importantly, in 28 U.S.C. § 46(b), Congress provided for the use of three-judge panels in all but the Federal Circuit (which is authorized to sit in panels of more than three, if its rules so provide) and in 28 U.S.C. § 46(c), also provided a statutory mechanism for hearings and rehearings en banc.

Now compare that to Florida's Constitution. The Florida Constitution does not leave it to the legislative branch to establish inferior courts. Nor does it leave determination of the subject matter jurisdiction of district courts of appeal to the Florida Legislature. Article V establishes district courts of appeal, governs their jurisdiction, commands how they are to be organized, and even dictates funding.

While the federal authority to review a case en banc was given by Congress and Congress also determined the organization and jurisdiction of United States Circuit Courts of Appeal, the Florida Constitution itself decides the organization and jurisdiction of district courts of appeal. Article V of the Florida Constitution constrains district courts to decide cases in panels of three. Article V, section 4 specifies that "[t]hree judges

69

shall consider each case and the concurrence of two shall be necessary to a decision."  Art. V, § 4(a), Fla. Const.

The fact that an issue is "mind-numbingly technical" does not mean that it should be waved away.  *Trump v. CASA*, 606 U.S. 831, 857 (2025) (Barrett, J.).  A constitutional debate over the subject matter jurisdiction of the district courts of appeal has been underway from the moment rule 9.331 was adopted.  *See In re Rule 9.331,* 374 So. 2d at 995 (Boyd, J., dissenting) ("Because the constitution specifically provides that three judges shall consider each case heard by the district courts, a different procedure cannot be authorized by the promulgation of a court rule.").  Subject matter jurisdiction is the "[p]ower of a particular court to hear the type of case that is then before it."  *The Florida Star v. B.J.F.*, 530 So. 2d 286, 288 (Fla. 1988).  The parties cannot stipulate to subject matter jurisdiction if the court does not have it, its absence is a defense that can be raised at any time, and any judicial action taken without it is void.  *See, e.g., Cunningham v. Standard Guar. Ins. Co.*, 630 So. 2d 179, 181 (Fla. 1994); *Strommen v. Strommen*, 927 So. 2d 176, 179 (Fla. 2d DCA 2006).

Subject matter jurisdiction is an imperative; every judge at every level of the court at every stage of litigation has an independent obligation to confirm that he or she does not exercise the judicial power without it.  An act taken in excess of jurisdiction—that is, an act that is done without the constitutional power to do it—is void, "and a void judgment can be attacked at any time, even collaterally."  *Strommen*, 927 So. 2d at 179.  Precedent on subject matter jurisdiction requires judges to independently consider their own jurisdiction, even if not raised by the parties.

Binding precedent also requires us to acknowledge that there are "two separate concepts" to be considered in a subject matter jurisdiction analysis. *The Florida Star*, 530 So. 2d at 288. First, the court must consider the grant of jurisdiction itself. *Id.* Second, the court must consider any "constitutional commands" and "limiting principles" dictated by the people as to how the court's jurisdiction is to be exercised. *Id.* On the latter point, the Florida Supreme Court has explained that a constitutional command as to how a court's jurisdiction is to be exercised is "a limiting principle dictated to this Court by the people of Florida," and a Florida court's "discretion to exercise" its jurisdiction is "narrowly circumscribed by what the people have commanded." *Id.*

If rule 9.331 is at odds with the original public meaning of article V, section 4, then this is a problem that demands our highest court's attention sooner rather than later. An act taken without subject matter jurisdiction is void, and subject matter jurisdiction can be challenged at any time, even collaterally. It is the rug that can be yanked from under anyone's feet at virtually any time. If the original public meaning of article V, section 4 was inconsistent with rule 9.331 in 1980, then there is nothing especially conservative about spending another forty years deciding cases in a manner that the people foreclosed in 1957.

In summary, I acknowledge without equivocation the Supreme Court's authority to determine the meaning of the Florida Constitution. I also acknowledge its precedent on the significance of subject matter jurisdiction, supremacy of text, and original public meaning. In view of the latter, I dissent from our review of this case en banc.

VILLANTI, J., Concurs.

71

———————————————

Opinion subject to revision prior to official publication.